**Liane FORCE, Lonnie Griffin, Nick Marino, and Otto Ladish, on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**ITT HARTFORD LIFE AND ANNUITY INSURANCE COMPANY, and Hartford Life Insurance Company, Defendants.**

**Civ. No. 97–1619 RHK/FLN.**

United States District Court,
D. Minnesota.

Jan. 26, 1998.

Jack L. Chestnut, Karl L. Cambronne, Chestnut & Brooks, Minneapolis, MN, Melvyn I. Weiss, Barry A. Weprin, Brad N. Friedman, Milberg, Weiss, Bershad, Hynes & Lerach, New York City, John J. Stoia, Jr., Theodore J. Pintar, JoBeth Halper, Milberg, Weiss, Bershad, Hynes & Lerach, San Diego, CA, Michael D. Craig Joann B. Harms, Schiffrin & Craig, Buffalo Grove, IL, Ronald R. Parry, Arnzen, Parry & Wentz, Covington, KY, W. Christian Hoyer John Newcomer, James, Hoyer, & Newcomer, Tampa, FL, Andrew S. Friedman, Francis J. Balint, Jr., Bonnett, Fairbourn, Friedman & Balint, Phoenix, AR, H. Sullivan Bunch, Bonnett, Fairbourn, Friedman, & Balint, Signal Mountain, TE, Stephen L. Hubbard, Rob Biederman, Cantilo, Maisel, & Hubbard, Dallas, TX, Allyn Z. Lite, Bruce D. Greenberg, Goldstein, Lite, & DePalma, Newark, NJ, William J. Dutel, Law Offices of William J. Dutel, Covington, LA, for Plaintiffs.

Barry A. Chasnoff, David A. Jones, Akin, Gump, Strauss, Hauer & Feld, San Antonio, TX, Gary J. Haugen, Richard A. Kempf, Maslon, Edelman, Borman, & Brand, Minneapolis, MN, for Defendants.

## MEMORANDUM OPINION AND ORDER

KYLE, District Judge.

### Introduction

Plaintiffs Liane Force ("Force"), Lonnie Griffin ("Griffin"), Nick Marino ("Marino"), and Otto Ladish ("Ladish") (collectively, the "Plaintiffs") are the representatives of a plaintiff class that initiated this action against Defendants ITT Hartford Life and Annuity Insurance Company and Hartford Life Insurance Company (collectively, "ITT Hartford"). The Defendants are owned by Hartford Fire Insurance Company, and both entities market and sell life insurance policies throughout the country. (Compl.¶¶ 17–23.) The Plaintiffs allege that the sales schemes and practices of the Defendants constituted fraud, misrepresentation, and violations of various Minnesota statutes. The Plaintiffs have brought claims against ITT Hartford for: (1) Fraud, Fraudulent Concealment and Deceit; (2) Fraudulent Inducement; (3) Breach of Fiduciary Duty/Constructive Fraud; (4) Breach of Contract; (5) Breach of the Implied Covenant of Good Faith and Fair Dealing; (6) Negligent Misrepresentation; (7) Negligence; (8) Deceptive Trade Practices in violation of Minn.Stat. §§ 325D.43 to 325D.48; (9) False Advertising in violation of Minn.Stat. § 325F.67; (10) Consumer Fraud in violation of Minn.Stat. §§ 325F.68 to 325F.70; and (11) Unjust Enrichment. (Compl.¶¶ 108–180.) The Complaint also states as "causes of action" the Plaintiffs' requests for declaratory and injunctive relief and for reformation of the policies at issue. (Id. ¶¶ 181–191.) The matter is before the Court on ITT Hartford's Motion to Dismiss.

### Background[1]

The Plaintiffs base their claims on the allegedly false and misleading practices that ITT Hartford used to market life insurance policies under three separate "schemes." The three at issue are the "vanishing premium scheme," the "churning scheme," and the "retirement/investment plan scheme." (See Compl. ¶¶ 3–8.) The gravamen of the Plaintiffs' claims is that ITT Hartford trained its sales agents to misrepresent to potential clients the true nature of the life insurance policies being offered, in an effort to boost the corporations' sales and profits.

In the 1980's, a change took place in the life insurance industry. Life insurance companies, including ITT Hartford, recognized that traditional life insurance was becoming obsolete in the face of other investment vehicles offering higher rates of return. (Compl.¶ 26.) Such companies faced increasing competition not only from mainstream investment funds, but also from insurers that would invest policyholders' premiums in high-risk investments like junk bonds. (Id.) As a result, ITT Hartford, like other insurers, developed new types of life insurance, where the insurance company would invest the premiums more aggressively and policyholders could enjoy the returns of successful investments. The investment strategy be-

---

1. For purposes of this Motion, the Court accepts as true all allegations in the Complaint and draws all reasonable inferences in favor of the Plaintiffs.

hind this new type of policy was more volatile and complex than traditional life insurance policies. (*Id.*)

## A. The Vanishing Premium Scheme

The first scheme that the Plaintiffs challenge is the vanishing premium scheme, in which the ITT Hartford sales agent would tell the potential customer that, after a certain number of premium payments, the value of the policy itself would generate sufficient income to maintain the policy for the remainder of the insured's life. (Compl. ¶ 29.) According to the ITT Hartford's sales agents, at a certain point, enough investment income would be generated that the policyholder's responsibility to pay premiums out of her own pocket would "vanish." (*Id.*) What the sales representatives did not tell the customers, according to the Plaintiffs, was that the policies would only become self-supporting (and the premiums thereby vanish) if a number of factors, including interest rates and dividend scales, turned out favorably. (*Id.* ¶ 31.) Although many of these market factors were highly speculative and many of the assumptions unreasonable, ITT Hartford's sales representatives did not advise the customers of the risk involved, but instead represented that the customers would not be obligated to make additional payments after the scheduled payments. (*Id.* ¶¶ 31–32.) When the policies did not generate the necessary capital to support the vanishing premium scheme, ITT Hartford first concealed these failures from the policyholders, and then demanded additional premiums from them. (*Id.* ¶ 33.)

## B. The Churning Sales Scheme

The Plaintiffs further allege that ITT Hartford fraudulently and deceptively convinced its customers to take the cash value of their existing policies and apply that capital to the acquisition of new policies from ITT Hartford. (Compl. ¶ 55.) This practice is called "churning" or "twisting," and, because of commissions to the agent and deductions and administrative charges to the company, results in a financial detriment to the policy-

holder and a corresponding benefit to both the insurance company and the sales agent.[2] (*Id.*) Sales agents targeted for churning both ITT Hartford policyholders and policyholders of ITT Hartford's competitors. (*Id.* ¶¶ 58–60.) In convincing potential customers to "churn" their policies, agents identified policyholders who had built up substantial cash values in existing policies, called them on the premise of conducting a "policy review," and represented that they could receive additional coverage at no additional expense. (*Id.* ¶ 61.) The agents failed to tell them that the new policy would be financed by loans taken out against the cash value of the policyholder's existing policy, and also failed to tell them about the commissions, administrative costs, and potential for higher premium payments which occurred as a result of churning. (*Id.* ¶¶ 56, 61.) In addition to the ITT Hartford agents' misrepresentations to customers about the benefits and drawbacks of churning, they did not provide customers with disclosure forms, as required by Minnesota law. (*Id.* ¶¶ 61–63.)

## C. Retirement/Investment Plans

Finally, the Plaintiffs allege that ITT Hartford fraudulently and deceptively marketed life insurance policies as "retirement," "savings," or "investment" plans. (Compl. ¶ 69–70.) Life insurance policies are distinct from, and have certain disadvantages relative to, investment plans, and ITT Hartford's sales agents intentionally concealed and/or downplayed these differences and disadvantages in marketing the policies. (*Id.* ¶¶ 69–73.) Specifically, the agents did not disclose that a portion of each premium payment funded a death benefit, and they represented falsely to customers that payment of a fixed number of premiums would result in a specific amount of future income. (*Id.* ¶ 71.)

## D. The Individual Plaintiffs

### 1. Liane Force

In January 1988, Liane Force met with an ITT Hartford sales agent. (Compl. ¶ 92.) At that time, she paid monthly premiums of

---

2. The Plaintiffs allege that ITT Hartford combined these two schemes by churning customers into vanishing premium policies. (Compl. ¶ 56, 64.)

$12.50 on an AETNA life insurance policy that had a face value of $3,000. (*Id.* ¶ 91.) The agent assured Force that if she cashed in her AETNA policy for an ITT Hartford Signature Series Flexible Premium Adjustable Life policy, she could continue paying monthly premiums of $12.50 and double the value of her insurance, to $6,000. (*Id.* ¶¶ 92–93.) Based on these representations, Force purchased the ITT Hartford policy. (*Id.* ¶¶ 93–94.) In 1994, ITT Hartford raised Force's monthly premiums to $30; in 1995, her premiums were again raised, to $40.[3] (*Id.*) Force continued paying the premiums after the initial increase, but ceased payment after the second increase. (*Id.* ¶ 94.)

### 2. Lonnie Griffin

In 1982, Lonnie Griffin and his wife met with an ITT Hartford agent, who sold the Griffins each a Signature Series Individual Decreasing Term Benefit with Flexible Premium Annuity Benefit policy. (Compl. ¶ 87.) The agent told Mr. and Mrs. Griffin that they would pay $100 every month until they reached age 55, at which point they would each have over $40,000 in their plan. (*Id.*) The agent marketed these policies as retirement plans, and never referred to them as life insurance policies. (*Id.*) In 1989, another ITT Hartford agent contacted the Griffins and advised them that ITT Hartford now offered a better retirement plan than the ones they had bought in 1982. (*Id.* ¶ 88.) The agent told them that they could cash in their 1982 plans, continue paying the same monthly amounts, and upon reaching age 55, their policies would each have a value of $200,000. (*Id.*) He also prepared for the Griffins a computer illustration which projected annual dividends of 9–10%. (*Id.*) Based on his representations, the Griffins cashed in their 1982 policies and bought the new policies, known as ITT Lifetime Series Universal I. (*Id.*)

Four years after purchasing the ITT Lifetime Series Universal I policies, the Griffins had an agent of another company review their policies. (*Id.* ¶ 89.) This agent in-

formed them that they had not purchased retirement plans, as they had believed, but life insurance policies. (*Id.*) Furthermore, when they calculated the amounts that should have constituted the accumulated cash value of the policies based on the representations made by the sales agent at the time of purchase, the Griffins found their actual accumulated cash value to be far less. (*Id.* ¶¶ 89–90.) In 1994, Mr. Griffin told ITT Hartford of his desire to cash out his policy. (*Id.* ¶ 90.) Based on the representations and projections made by the ITT Hartford agents at the time of purchase, his policy should have had a cash value of $11,000 at that time; however, ITT Hartford advised him that the cash value of his policy was $5,000. (*Id.*) This was because the dividends were not being paid at a rate of 9–10%, as the agent had told them in 1989, but at a rate of 3.5%. (*Id.*)

### 3. Nick Marino

In 1987, Nick Marino was advised by an ITT Hartford sales agent that his existing life insurance policy with ITT Hartford had become obsolete, and that he would be better served by a new policy issued by ITT Hartford. (Compl. ¶ 96.) Marino owned an ITT Hartford policy with a face value of $100,000, for which he paid annual premiums of approximately $1,300. (*Id.* ¶ 95.) The agent told Marino that if he were to replace his existing policy with a new "streamline" ITT Hartford policy, he could continue making approximately the same annual premium and would accumulate much more cash value in his policy. (*Id.* ¶ 96.) Based on these representations, Marino cashed in his old policy and replaced it with an ITT Hartford Universal Life Signature Series policy. (*Id.* ¶ 97.) He continued to make annual payments in approximately the same amount as under his old policy. (*Id.*) In 1994, however, ITT Hartford advised Marino that it was increasing his annual premiums from $1,686 to $3,355.56, and that the cost of his insurance would increase annually. (*Id.* ¶ 98.)

---

**3.** Initially, Force was told that her monthly premium had been increased to $35. When she contacted ITT Hartford, however, she was told that they had actually been increased to $40. (Compl. ¶ 94.)

### 4. Otto Ladish

In 1992, Otto Ladish contacted an ITT Hartford sales agent about the possibility of purchasing insurance that would pay for the cost of nursing home care, should it become necessary for him to move into a nursing home. (Compl.¶ 99.) The agent told Ladish that he could purchase a $213,817 life insurance policy from ITT Hartford by making six annual payments of $8,531. (*Id.* ¶¶ 99–100.) After the sixth annual payment, according to the agent, no further payments would be necessary; the agent also showed Ladish an illustration that purported to demonstrate that the policy would require only six such payments. (*Id.* ¶ 100.) Based on these representations, Ladish purchased an ITT Hartford Last Survivor, Interest Sensitive life insurance policy. (*Id.*) Four years later, in 1996, ITT Hartford notified Ladish that the policy would not be paid off by those six payments, and that he would be required to make annual payments in that amount for at least an additional three years. (*Id.* ¶ 101.)

### E. The Written Agreements

Each of the named Plaintiffs received a written policy after orally agreeing with the agent to purchase the insurance. (Kolthoff Aff. Exs. B, D, F, H, & J (policies of Force,

Griffin, Marino, & Ladish).)[4] Each written policy contained provisions either identical or substantively similar to the following three provisions:

(1) "THE ENTIRE CONTRACT— *Your* policy is a legal contract between *you* and [*ITT Hartford.*] It consists of this policy, a copy of the application, and any attached riders, benefit provisions or endorsements."[5]

. . . .

(2) "MODIFICATION OR CHANGE— *Your* policy may be modified only by *our* written agreement signed by an executive officer. No agent or other person has the authority to change *your* policy or waive any of its terms or provision."[6]

. . . .

(3) "EXCESS INTEREST—We may declare payment of interest in excess of the guaranteed rate from time to time. Payment of excess interest is not guaranteed. We may declare different rates of excess interest payable on premiums accumulated at different times."[7]

### Analysis

#### A. Standard of Review

In considering a motion to dismiss for failure to state a claim upon which relief may

---

**4.** In the Complaint, the Plaintiffs repeatedly refer to the policies that they purchased from ITT Hartford, but do not attach copies of the policies. The Court, therefore, may consider these materials—even though they were submitted by ITT Hartford—without converting ITT Hartford's Motion to Dismiss into a motion for summary judgment. *See Silver v. H & R Block, Inc.,* 105 F.3d 394, 396 (8th Cir.1997) (holding that a plaintiff cannot defeat a motion to dismiss by omitting documents which are referenced in the complaint and are integral to her cause of action); *Brogren v. Pohlad,* 933 F.Supp. 793, 798 (D.Minn.1995) (holding that, in a motion to dismiss, a court may consider documents outside of the pleadings if they are referenced in the complaint). In resolving the instant Motion, therefore, the Court will consider the written policies referred to in the Complaint and submitted by ITT Hartford as Attachments B, D, F, H, and J to the Kolthoff Affidavit. Importantly, the Plaintiffs do not dispute the accuracy of these documents. (*See* Pls.' Mem. In Opp'n to Defs.' Mot. to Dismiss at 8) ("Pls.' Mem."). However, the Court will not consider the policy illustrations attached as Exhibits A, C, E, G, and I to the Kolthoff Affidavit. It is not evident that these are the illustra-

tions referred to in the Complaint, and it would, therefore, be inappropriate for the Court to consider these submissions in resolving a motion to dismiss.

**5.** Kolthoff Aff. Ex. D at HART00030 (Griffin 1989 policy); *see also* Kolthoff Aff. Ex. B at HART00007 (Griffin 1982 policy); Kolthoff Aff. Ex. F at HART00053 (Force policy); Kolthoff Aff. Ex. H at HART00077 (Marino policy); Kolthoff Aff. Ex. J at HART00131 (Ladish policy).

**6.** Kolthoff Aff. Ex. D at HART00030 (Griffin 1989 policy); *see also* Kolthoff Aff. Ex. B at HART00007 (Griffin 1982 policy); Kolthoff Aff. Ex. F at HART00053 (Force policy); Kolthoff Aff. Ex. H at HART00077 (Marino policy); Kolthoff Aff. Ex. J at HART00131 (Ladish policy).

**7.** Kolthoff Aff. Ex. D at HART00032 (Griffin 1989 policy); *see also* Kolthoff Aff. Ex. B at HART00014 (Griffin 1982 policy); Kolthoff Aff. Ex. F at HART00055 (Force policy); Kolthoff Aff. Ex. H at HART00079 (Marino policy); Kolthoff Aff. Ex. J at HART00129 (Ladish policy) ("We may pay or credit excess interest of such amount and in such manner as we determine.").

be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must take as true the allegations contained in the complaint. *Cooper v. Pate*, 378 U.S. 546, 546, 84 S.Ct. 1733, 1733, 12 L.Ed.2d 1030 (1964) (per curiam). A complaint

> must be viewed in the light most favorable to the plaintiff and should not be dismissed merely because the court doubts that a plaintiff will be able to prove all of the necessary factual allegations. "Thus, as a practical matter, a dismissal under Rule 12(b)(6) is likely to be granted only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief."

*Fusco v. Xerox Corp.*, 676 F.2d 332, 334 (8th Cir.1982) (quoting *Jackson Sawmill Co. v. United States*, 580 F.2d 302, 306 (8th Cir. 1978)). Viewing the complaint in this manner, the Court may dismiss a case under Rule 12(b)(6) only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984) (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)).

### B. Choice of Law

Although ITT Hartford does business in Minnesota,[8] each of the named Plaintiffs is a Florida resident, and each policy was purchased in Florida. (Compl. ¶¶ 13–16; *see also* Pls.' Opp'n Mem. at 39.) Therefore, ITT Hartford contends that the Court should apply Florida substantive law to the Plaintiffs' common law claims. (Defs.' Mem. in Supp. of Mot. to Dismiss at 11 n.7.) ("Defs.' Supp. Mem.") The Plaintiffs do not dispute whether Florida law should apply, but merely state that "[s]ince ITT Hartford has made no effort to demonstrate any difference between Minnesota law and Florida law that would materially alter the outcome of this litigation, the Court need not make a choice of law determination, and may look freely to the law of both interested jurisdictions." (Pl.'s Mem. at 11 n.8.) The Court, therefore, will generally apply Florida substantive law to the Plaintiffs' common law claims, but is constrained to do so only when that law differs materially from the substantive law of Minnesota. *See Nesladek v. Ford Motor Co.*, 46 F.3d 734, 736–37 (8th Cir.1995). To the extent that Minnesota law is consistent with Florida law, the Court may apply either body of substantive law. *See Phillips v. Marist Soc'y*, 80 F.3d 274, 276 (8th Cir.1996).

### C. The Common Law Claims

### 1. Claims Based Upon Misrepresentation

ITT Hartford contends that all of the Plaintiffs' misrepresentation claims should be dismissed because they cannot state such a claim, for three reasons: (1) any reliance by the Plaintiffs on the agents' misrepresentations was unreasonable; (2) the Plaintiffs ratified the written contracts, which explained the policy terms, by continuing to pay premiums after receiving the written contracts; and (3) Florida's economic loss rule bars any claims for fraud or negligent misrepresentation arising form the breach of any oral contracts or agreements. (Def.'s Supp. Mem. at 11–16.)

■ As an initial matter, the Court rejects ITT Hartford's argument that it is entitled to a dismissal under Rule 12(b)(6) on the issue of whether the Plaintiffs' reliance was reasonable. Such a determination hinges on questions of fact, and it would be inappropriate for this Court to make such a determination at this stage in the proceedings. ITT Hartford cites a "vanishing premium" case from another jurisdiction in support of its argument that any reliance by the Plaintiffs was unreasonable. (Def.'s Mem. at 12, citing *Kiehl v. Jackson Nat'l Life Ins. Co.*, No. C–95–2645, 1996 WL 241788, 1996 U.S. Dist. LEXIS 6966 (N.D.Cal. Apr. 30, 1996).) Significantly, however, the matter before the court in *Kiehl* was a motion for summary

---

**8.** The Complaint alleges that Defendant ITT Hartford Life and Annuity Company is headquartered in Hennepin County, Minnesota, and is licensed to do business in the state of Minnesota.

(Compl. ¶ 10 .) It also alleged that Defendant Hartford Life Insurance Company is licensed to do business in the state of Minnesota. (Compl.¶ 11.)

judgment. The court in *Kiehl* determined that, in light of the documents produced by the defendant, no reasonable trier of fact could have found—as the plaintiffs claimed—that they had originally been issued a different policy than that produced by the defendant. *Kiehl*, 1996 WL 241788, at *2, 1996 U.S. Dist. LEXIS 6966, at *6. The decision in *Kiehl*, therefore, while possibly relevant to any eventual summary judgment motion in the instant case, is inapposite to the motion presently before the Court. Accordingly, the Court rejects ITT Hartford's argument that a dismissal pursuant to Rule 12(b)(6) would be appropriate, given the allegations made by the Plaintiffs and viewing the Complaint and the written contracts referred to therein in a light most favorable to the Plaintiffs. ITT Hartford urges this Court to hold that any reliance by the Plaintiffs on the agents' oral misrepresentations is unreasonable as a matter of law in light of the subsequent written contracts, and the Plaintiffs' continued payment of premiums. However, the Court declines to fashion a *per se* rule governing reliance in such a situation, and the Court cannot find that the Plaintiffs could not, under any set of facts consistent with the pleadings, show that their reliance was reasonable.

 Similarly, ITT Hartford's argument that the Plaintiffs ratified the terms of the written policies is premature. Under Florida law,

> [t]he power of avoidance for fraud or misrepresentation is lost if the injured party[,] after acquiring knowledge of the fraud or misrepresentation[,] manifest[s] to the other party to the transaction an intention to affirm it[;] the injured party must assert his remedial rights with diligence and without delay upon becoming aware of the fraud. After he obtains knowledge of the fraud or has been informed of facts and circumstances from which such knowledge would be imputed to him, a delay in instituting judicial proceedings for relief, generally, will be regarded as a bar to equitable relief.

*Farnham v. Blount*, 152 Fla. 208, 215, 11 So.2d 785, 788–89 (1942); *see also Lowy v. Kessler*, 522 So.2d 917, 918–19 (Fla.Dist.Ct.

App.1988) ("Deeply embodied legal principles require that a person unwilling to act under the terms of a contract not induce the belief that she assents to its terms by standing by silently and performing under it."). Actual knowledge of the fraud is not required; ratification can apply as well when circumstances exist "such that [a party] must have or should with reasonable diligence have discovered" the fraud. *Reynolds v. The Surf Club*, 473 So.2d 1327, 1337 (Fla.Dist.Ct.App.1985).

The question of whether the Plaintiffs knew or should have known of the discrepancies between the oral and written representations, and any related fraud on the part of ITT Hartford, is an issue of fact, not amenable to resolution on a Rule 12(b)(6) motion to dismiss. This Court can conceive of a factual context in which the written policies so clearly spelled out how, when, and why the amount of premiums could increase beyond what was orally promised by the sales agent that dismissal under Rule 12(b)(6) could be appropriate. Factually, however, that is not the instant case. The terms of the written policies are not so clear and unequivocal as to render the Plaintiffs' reliance *per se* unreasonable, and ITT Hartford has not shown that the Plaintiffs could not, under any set of facts consistent with the pleadings, demonstrate the reasonableness of their reliance on the agents' representations.

The issue of Florida's economic loss rule, however, is more difficult, and requires a more thorough examination of Florida law. ITT Hartford argues that, because Florida's economic loss rule bars plaintiffs from asserting tort claims that do not arise independently from an alleged breach of contract, the Plaintiffs are barred from asserting claims that are based on misrepresentation. (Def.'s Mem. at 15–16.) The Plaintiffs respond that fraudulent inducement constitutes an independent tort and, therefore, the economic loss rule does not bar any of their claims. (Pls.' Mem. at 25.)

 Florida's economic loss rule prevents a plaintiff from asserting tort claims if such claims do not arise independently of claims for breach of contract. *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A .*, 685 So.2d 1238, 1239 (Fla.1996); *see also Casa Clara Condo-*

*minium Ass'n. Inc. v. Charley Toppino & Sons, Inc.*, 620 So.2d 1244, 1246 (Fla.1993) ("For recovery in tort, there must be a showing of harm above and beyond disappointed expectations. A buyer's desire to enjoy the benefit of his bargain is not an interest that tort law traditionally protects.") (quotation and citation omitted); *AFM Corp. v. Southern Bell Tel. & Tel. Co.*, 515 So.2d 180, 181–82 (Fla.1987) ("We conclude that without some conduct resulting in personal injury or property damage, there can be no independent tort flowing from a contractual breach which would justify a tort claim solely for economic losses.").

■ In the instant case, the Plaintiffs seek to recover the benefit of what they allegedly bargained for with the ITT Hartford sales agents. Florida's economic loss rule, therefore, operates in the instant case to bar the Plaintiffs' tort claims for Fraud, Fraudulent Concealment, and Deceit; Constructive Fraud; Negligent Misrepresentation; and Negligence.

■ However, Florida courts have recognized an exception to the economic loss rule for claims of fraudulent inducement. "Fraudulent inducement is an independent tort in that it requires proof of facts separate and distinct from the breach of contract. It normally occurs prior to the contract and the standard of truthful representation placed upon the defendant is not derived from the contract ...." *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So.2d 1238, 1239 (Fla.1996) (quotation and citation omitted). The court in *HTP* affirmed the lower court's holding that the economic loss rule did not bar the plaintiff's claim for fraudulent inducement, where the plaintiff alleged that it had entered into a settlement agreement based upon the defendant's fraud. *Id.* at 1240. The court also expressly rejected the holding of a conflicting lower court decision that fraudulent inducement claims cannot coexist with breach of contract claims.[9]

The issue of the economic loss rule's impact on claims of fraudulent inducement was more recently discussed in *Hotels of Key Largo, Inc. v. RHI Hotels, Inc.*, 694 So.2d 74 (Fla.Dist.Ct.App.), *review denied*, 700 So.2d 685 (Fla.1997). In *Key Largo*, the court affirmed the trial court's dismissal of the plaintiffs' fraudulent inducement claim because of the economic loss rule. Rejecting the position that "one can always avoid operation of the economic loss doctrine by merely pleading fraud in the inducement," the court held that whether a claim for fraudulent misrepresentation is barred depends upon the specific factual scenario in which the claim arises. *Key Largo*, 694 So.2d at 77. "It makes sense," wrote the court,

> that a truly independent cause of action for fraudulent misrepresentation, where the ability of one party to negotiate fair terms is undermined by the other's fraudulent behavior, is not barred by the economic loss rule. However, where the only alleged misrepresentation concerns the heart of the parties' agreement, simply applying the label of "fraudulent inducement" to a cause of action will not suffice to subvert the sound policy rationales underlying the economic loss doctrine.

*Id.* The Court finds that Florida courts have not adopted a *per se* rule regarding whether the economic loss rule applies to claims of fraudulent inducement; rather, such a determination depends on the specifics of each case.

■ In the instant case, the Court finds that dismissal of the Plaintiffs' fraudulent inducement claim at this stage of the proceedings would be inappropriate. Whether their claim for fraudulent inducement is "interwoven and indistinct from the heart of the contractual agreement," *Key Largo*, 694 So.2d at 78, and therefore barred, is a matter that does not lend itself to resolution on a Rule 12(b)(6) motion to dismiss. Specifically,

---

9. In *Woodson v. Martin*, 663 So.2d 1327 (Fla. Dist.Ct.App.1995) (en banc), the court of appeals had come to the opposite conclusion than did the panel of the court of appeals in *HTP. See HTP*, 685 So.2d at 1238 (observing that the two lower court opinions "expressly and directly conflict[ ]" with each other). The Florida Supreme Court resolved this split by rejecting the *Woodson* court's analysis that the two theories of recovery are mutually exclusive, and affirming the panel in *HTP. HTP*, 685 So.2d at 1240; *see also Woodson v. Martin*, 685 So.2d 1240 (Fla.1996) (reversing the lower court's holding).

ITT Hartford has not shown that, under any set of facts consistent with the pleadings, the Plaintiffs would be unable to show that their ability "to negotiate fair terms and make an informed decision [has been] undermined by [ITT Hartford's] fraudulent behavior." *HTP*, 685 So.2d at 1240, *quoted in Key Largo*, 694 So.2d at 77.

[8] The Court agrees with ITT Hartford that Florida's economic loss rule bars the Plaintiffs' tort claims. However, because of the exception recognized by Florida courts for claims of fraudulent inducement, the Court rejects ITT Hartford's argument about the economic loss rule with regard to that claim. Accordingly, the Court will grant ITT Hartford's Motion to Dismiss with regard to the Plaintiffs' claims for Fraud, Fraudulent Concealment, and Deceit (First Cause of Action); Negligent Misrepresentation (Sixth Cause of Action); and Negligence (Seventh Cause of Action);[10] and the Court will deny ITT Hartford's Motion to Dismiss with regard to the Plaintiffs' claim for Fraudulent Inducement (Second Cause of Action). The Plaintiffs have included in their Complaint a claim for "Breach of Fiduciary Duty/Constructive Fraud." (Compl.¶¶ 123–32.) The Court will also deny ITT Hartford's Motion to Dismiss with regard to the Plaintiffs' claim for Breach of Fiduciary Duty (Third Cause of Action), because of the contractual nature of that claim. (*See* infra pp. 20–23.) To the extent that the Plaintiffs intended to state a cause of action for Constructive Fraud in their Third Cause of Action, however, the Court will grant the Motion to Dismiss that claim, for the reason that it is barred by Florida's economic loss rule.

*2. Breach of Fiduciary Duty*

■■■■ ITT Hartford argues that Florida law does not impose a fiduciary duty on insurers, and that "the relationship between an insured and his insurer is contractual." (Def.'s Mem. at 17) (citing *Central Mut. Ins. Co. v. Cropper*, 296 So.2d 69, 71 (Fla.Dist.Ct.App. 1974)). A fiduciary relationship between an insurer and an insured arises under Florida law, it argues, only when the insurer undertakes to defend a claim filed by a third party against the policyholder. (*Id.*) The Plaintiffs respond, however, by arguing that Florida law does not *per se* preclude a finding of a fiduciary relationship between an insurer and an insured, and that the existence *vel non* of a fiduciary relationship depends on the factual context of that particular relationship. (Pls.' Mem. at 32–35.)

ITT Hartford does not direct the Court to any Florida case that precludes the finding of a fiduciary relationship in circumstances similar to those presented in the instant case. Because this Court has found no clear Florida case law indicating that Florida courts would find a *per se* rule precluding a finding of a fiduciary relationship between an insurer and a potential insured, this Court will not fashion such a rule.

■■■■ Instead, the Court will apply the basic Florida law that the existence of a fiduciary relationship is a question of fact. *Capital Bank v. MVB, Inc.*, 644 So.2d 515, 518 (Fla.Dist.Ct.App.1994) ("Fiduciary relationships are either expressly or impliedly created.... Fiduciary relationships implied in law are premised on the specific factual situation surrounding the transaction and the relationship of the parties.") The existence

10. The economic loss rule bars the Plaintiffs' claims for negligence. Even if it did not, however, the Court would dismiss these claims. The Plaintiffs concede that their claim of negligence can be properly characterized as claims for negligent hiring, training, supervision, and retention. (*See* Compl. ¶¶ 153–55; Pl.'s Mem. at 31.) Under Florida law, to state a claim for any of these torts, a plaintiff must allege, *inter alia,* that the employee's misconduct occurred outside the scope of his employment. *See Garcia v. Duffy*, 492 So.2d 435, 438–39 (Fla.Dist.Ct.App.1986). From the face of the Complaint, it is clear that the Plaintiffs have not alleged misconduct on the part of any ITT Hartford employee that was

outside the scope of employment. (*See* Compl. ¶¶ 153–55.) Furthermore, the Plaintiffs have not argued in their Memorandum to this Court that the misconduct of the Hartford employees occurred outside the scope of their employment. For these reasons, the Court finds that the Plaintiffs could not, under any set of facts consistent with the pleadings, state a claim for negligent hiring, training, supervision, or retention against ITT Hartford. Accordingly, the Court would grant ITT Hartford's Motion with regard to the claim of negligence and dismiss that count, regardless of the operation of the economic loss doctrine upon those claims.

of a fiduciary relationship is governed, in part, by the test of whether "confidence is reposed by one party and a trust accepted by the other." *Dale v. Jennings*, 90 Fla. 234, 244, 107 So. 175, 179 (Fla.1925), *quoted in Capital Bank*, 644 So.2d at 518.[11]

Florida courts have found that Florida's economic loss rule bars claims for breach of fiduciary duty in certain circumstances. *See McCutcheon v. Kidder, Peabody & Co., Inc.*, 938 F.Supp. 820, 823–24 (S.D.Fla.1996). In *McCutcheon*, the court applied Florida's economic loss rule and held that the plaintiff's claims for breach of fiduciary duty were barred because they arose "solely as a result of the existence of a contract between the parties." *McCutcheon*, 938 F.Supp. at 824. Another federal court applying Florida's economic loss rule to a breach of fiduciary duty claim held that it did not bar the claim, because it was "largely unrelated to the contract claim." *Future Tech Int'l, Inc. v. Tae Il Media, Ltd.*, 944 F.Supp. 1538, 1569 (S.D.Fla.1996). The court elaborated that, under Florida law, "when the parties' contract is the source of the fiduciary duty claim, the economic loss rule may apply." *Future Tech*, 944 F.Supp. at 1569. In that case, however, the court found that the alleged fiduciary duty related to acts by the defendants that were not addressed in the contracts at issue and, as a result, the economic loss rule was inapplicable. *Future Tech*, 944 F.Supp. at 1569.

In the instant case, ITT Hartford has not demonstrated to the Court that the Plaintiffs' allegations of breach of fiduciary duty arose solely as a result of the contracts between the parties. On the contrary, the Plaintiffs appear to argue that ITT Hartford agents committed breaches of their fiduciary duty at various times, including prior to the parties' mutual agreement to any contract.

ITT Hartford has not shown that, as a matter of law, the Plaintiffs have failed to state a claim on which relief can be granted. Accordingly, the Court will deny ITT Hartford's Motion to Dismiss with regard to the Plaintiffs' claim for breach of fiduciary duty.

### 3. Breach of Contract

ITT Hartford argues that the Plaintiffs' claim for breach of contract must be dismissed because Florida's parol evidence rule "bars claims arising out of prior extrinsic agreements, oral or written, which contradict the terms of a fully integrated document." (Def.'s Mem. at 18) (quoting *In re Estate of Barry*, 689 So.2d 1186, 1187 (Fla.Dist.Ct.App. 1997).) Furthermore, it claims that the Plaintiffs have made no allegations of any breach of the fully integrated written contract. (*Id.* at 18–20.) The Plaintiffs respond that the parol evidence rule does not apply to the agreements at issue because: (1) the written policies were not fully integrated; (2) the written policies are ambiguous; (3) the extrinsic evidence does not contradict the written contract; and (4) the policies were procured by fraud, mistake, and inequitable conduct. (Pls.' Mem. at 25.)

Florida's parol evidence rule bars claims arising out of prior extrinsic agreements that contradict the terms of a fully integrated agreement. *See In re Estate of Barry*, 689 So.2d 1186, 1187 (Fla.Dist.Ct.App. 1997). However, there are several excep-

---

11. The Court finds instructive the reasoning of the court in *Dornberger v. Metropolitan Life Ins. Co.*, 961 F.Supp. 506, 545–47 (S.D.N.Y.1997). In *Dornberger*, the court considered the same issue and reached the same conclusion as this Court, although applying the law of New York. Recognizing the changing nature of the practice of insurance and the specific factual context before it, the *Dornberger* court rejected the argument of the defendant insurance company that there was *per se* no fiduciary duty in the relationship between an insurer and its insured, but that it was a matter for a jury to decide. *Dornberger*, 961 F.Supp. at 546–47. The following footnote in *Dornberger* is persuasive and, while obviously not binding on Florida courts, at least argues against the *per se* rule urged upon this Court by ITT Hartford:

> A leading treatise states that older decisions which refused to recognize a fiduciary relationship between insurer and insured may now be "out of step with current concepts." 12 John Alan Appleman & Jean Appleman, Insurance Law and Practice § 7004 (1981). The treatise notes that "[p]articularly is this approach outmoded when television advertising repeatedly refers to 'the good hands' of the insurer or how it is 'like a good neighbor', implying an ability to place trust and reliance upon the broad shoulders of the kindly company." *Id.*

*Dornberger*, 961 F.Supp. at 547 n. 39.

tions to this broad doctrine, which allow a party to present evidence of prior extrinsic agreements even where a fully integrated agreement exists. While the Plaintiffs claim that several such exceptions apply in the instant case, the Court need only consider one: allegations of fraud. (*See* Pls.' Mem. at 25.)[12] Florida courts have long recognized "the well-established rule that alleged fraudulent misrepresentations may be introduced into evidence to prove fraud notwithstanding a merger clause in a related contract." *Wilson v. Equitable Life Assurance Soc'y*, 622 So.2d 25, 27 (Fla.Dist.Ct.App.1993); *see also Nobles v. Citizens Mortgage Corp.*, 479 So.2d 822 (Fla.Dist.Ct.App.1985). In the instant case, the Plaintiffs have alleged fraud both on the part of the individual ITT Hartford sales agents and on the part of ITT Hartford itself in subsequently concealing the agents' fraud. (Compl. ¶¶ 31, 47, 50–53, 85.) Accordingly, it would be inappropriate for the Court to dismiss the Plaintiffs' breach of contract claims.[13]

ITT Hartford argues that the Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing should be dismissed because this covenant is dependent on either an underlying breach of contract claim or the existence of a fiduciary relationship. (Def.'s Mem. at 20–21.) Because the Plaintiffs have shown neither, argues ITT Hartford, the Court must dismiss this derivative claim as well. (*Id.*) However, as explained above, the Court finds that the Plaintiffs have stated claims both for breach of contract and for breach of fiduciary duty. Because of this finding, the Court will not dismiss the Plaintiffs' claim for breach of the covenant of good faith and fair dealing.

ITT Hartford also argues that it is entitled to summary judgment on the Plaintiffs' claim for breach of fiduciary duty because "the defendants have not acted in bad faith in connection with their duties under the written contracts" and because Florida law allows for a claim for breach of the covenant of good faith and fair dealing only if the plaintiff can show an underlying breach of contract. (Defs.' Mem. at 20.) In support of these related arguments, ITT Hartford cites to *Anthony Distributors, Inc. v. Miller Brewing Company*, 941 F.Supp. 1567 (M.D.Fla.1996). In *Anthony Distributors*, the matter before the court was a motion for summary judgment on the plaintiff's claims for breach of contract and for breach of the covenant of good faith and fair dealing. The court granted the motion, but did so on grounds that render the case inapposite to the instant case. The court first dealt with the allegations that the defendant had breached an express contractual provision, holding that the plaintiff had not presented sufficient evidence on this claim to survive summary judgment. *Anthony Distrib.*, 941 F.Supp. at 1574. After so holding, the court discussed what type of underlying breach, if any, is necessary for a plaintiff to state a claim for breach of the implied covenant of good faith and fair dealing. After first stating in dicta that the court adopted the rule that "the implied covenant of good faith and fair dealing is not actionable absent a breach of the contract's express terms," the court went on to suggest that the rule it was adopting was not so clear. *Id.* The court found that the plaintiff had not presented sufficient evidence on its claim for breach of the implied covenant of good faith and fair dealing, and dismissed it for that reason. *Id.* at 1574–75

---

12. The Plaintiffs cite three other reasons that the parol evidence rule is inapplicable to the instant case: (1) the policies are not fully integrated; (2) the policies are ambiguous; and (3) the extrinsic evidence does not contradict the written contracts. (Pls.' Mem. at 25.) Because the Court finds that the fraud exception is applicable, it will not address these other arguments.

13. In its Reply Memorandum, ITT Hartford does not cite any cases in support of its argument that the fraud exception to the parol evidence rule should not apply in the instant case; rather, it simply argues that the fraud exception should

not apply because, if it did, "[a]nyone seeking to alter the terms of a contract improvidently entered into could simply allege that they were fraudulently induced to enter the contract in order to offer extrinsic evidence of the agreement they wish they had made." (Def.'s Reply Mem. at 13.) The Court finds, however, that ITT Hartford's argument would read the fraud exception out of existence. Because of the Plaintiffs' allegations of fraud in the inducement, the Court finds that this is precisely the type of situation where the fraud exception to the parol evidence rule should be applied.

("Even if Anthony is correct in their bare assertion that breach of good faith is independent of breach of contract, they fail to advance any record evidence [of a breach of good faith].... Therefore, the Court grants summary judgment in favor of Miller ..., *regardless of whether breach of good faith is independent of breach of contract.*") (emphasis added).

■ In light of the Court's denial of ITT Hartford's Motion with regard to the Plaintiffs' claims for breach of contract and for breach of fiduciary duty, however, resolution of that issue is not necessary to the instant Motion. ITT Hartford has not demonstrated that the Plaintiffs, under no set of facts consistent with their pleadings, will be able to show a breach of the covenant of good faith and fair dealing. Again, the Court expresses no opinion on the ultimate resolution of these claims, but merely finds that ITT Hartford has not met the high standard necessary on a Rule 12(b)(6) motion.[14]

### D. The Statutory Claims

In addition to their tort and contract claims, the Plaintiffs allege that ITT Hartford's sales practices violated three Minnesota statutes: the Minnesota Deceptive Trade Practices Act, Minn.Stat. §§ 325D.43–.48 (the "Trade Act"); the Minnesota False Statement in Advertising Act, Minn.Stat. § 325F.67 (the "Advertising Act"); and the Minnesota Consumer Fraud Act, Minn.Stat. §§ 325F.68–.70 ("Fraud Act").

■ ITT Hartford makes a broad argument that all of the Plaintiffs' statutory claims are barred, because the Insurance Trade Practices Act, Minn.Stat. ch. 72A (the "Insurance Act") governs such claims in the insurance industry and effectively precludes claims brought under other, more general,

statutory causes of action. (Def.'s Reply Mem. at 16–17.)[15] In support of this contention, ITT Hartford cites *Morris v. American Family Mutual Insurance Company*, 386 N.W.2d 233 (Minn.1986), for the proposition that the Minnesota Legislature intended to comprehensively regulate the insurance industry through the Insurance Act and to preclude other causes of action against insurers. (*See* Def.'s Mem. at 25–26; Def.'s Reply Mem. at 16–17.) *Morris*, however, is not as broad as ITT Hartford asserts, and holds only that no private cause of action exists against an insurer under the Minnesota Unfair Claims Practices Act. *See Morris*, 386 N.W.2d at 237. Accordingly, the Court rejects ITT Hartford's argument that the Minnesota Legislature intended, in passing the Insurance Act, to proscribe claims against insurers brought under the Deceptive Trade Practices Act, the False Statement in Advertising Act, or the Consumer Fraud Act, as these statutes are applied to the insurance industry.

### 1. Deceptive Trade Practices Act

ITT Hartford argues that the Plaintiffs have not stated a claim upon which relief can be granted under the Trade Act, because they have not alleged any "likelihood of confusion" resulting from ITT Hartford's "passing off" of its policies as those of another. (Def.'s Mem. at 23.) The Plaintiffs respond that there is no such requirement in § 325D.44, subds. 1(5) or 1(9), the provisions under which they are proceeding. (Pls.' Mem. at 36–37.)

■ There is nothing in the language of Minn.Stat. § 325D.44, subds. 1(5) or 1(9) that requires a plaintiff to show a likelihood of confusion about the source of the goods in

---

**14.** The Court rejects ITT Hartford's argument that the economic loss rule bars the Plaintiffs' claim for breach of the covenant of good faith and fair dealing. (Def.'s Mem. at 22 n.16.) Florida's economic loss rule, as explained in pages 16–20, *supra*, bars certain tort claims in certain circumstances. Breach of the covenant of good faith and fair dealing, however, is a contractual claim and is not affected by the economic loss rule. *See North American Van Lines, Inc. v. Lexington Ins. Co.*, 678 So.2d 1325, 1330 (Fla. Dist.Ct.App.1996) ("In Florida, a bad faith claim

is an action ex contractu."), *review denied*, 692 So.2d 185 (Fla.1997).

**15.** While ITT Hartford originally argued that the Insurance Act precluded merely the Plaintiffs' cause of action under the Consumer Fraud Act (*see* Def.'s Mem. at 25–26), it expanded this argument in its Reply Memorandum to encompass all of the Plaintiffs' statutory causes of action. (Def.'s Reply Mem. at 16–17.)

question.[16] In fact, the structure of the statute suggests just the opposite: that no such showing is required. The statute specifically lists thirteen separate ways in which a plaintiff can establish a violation, and only three of the thirteen contain an explicit requirement that the defendant cause or create a likelihood of confusion about the product. *See* Minn.Stat. § 325D.44, subds. 1(2), 1(3), and 1(13).[17] ITT Hartford, however, cites to cases which, it argues, have construed the Trade Act to require such a showing for any violation thereof. *See CSM Investors, Inc. v. Everest Dev., Ltd.,* 840 F.Supp. 1304, 1314 (D.Minn.1994) ("The primary element of a claim under the [Trade Act] requires a showing of likelihood of confusion."); *Krueger v. State Farm Fire & Cas. Co.,* 510 N.W.2d 204, 211 (Minn.Ct.App.1993). However, the plaintiffs in *CSM Investors* and *Krueger* alleged violations of those provisions of the Trade Act that specifically required a showing of either "pass[ing] off goods or services as those of another," Minn.Stat. § 325D.44, subd. 1(1), or a "likelihood of confusion or of misunderstanding" as to some aspect of the goods. *Id.* §§ 325D.44, subds. 1(2), (3). In the instant case, the Plaintiffs have alleged violations of subdivisions 1(5) and 1(9) of the Trade Act, neither of which contains any such requirement.

■ Moreover, ITT Hartford's contention that this claim must be dismissed because it fully complied with government regulations is without merit. The Plaintiffs have alleged conduct by ITT Hartford which, if true, would constitute violations of several Minnesota and Florida statutes. The "com-

pliance exemption," therefore, is inapplicable at this stage of the proceedings. Finally, ITT Hartford's argument that the Trade Act does not provide a private remedy of money damages is without merit. (*See* Def.'s Mem. at 24 .) The Trade Act provides for private remedies in Minn.Stat. § 325D.45. The fact that it does not provide for monetary damages is irrelevant to the issue of whether the Plaintiffs have stated a claim upon which relief could be granted. Accordingly, the Court will deny ITT Hartford's Motion with regard to the Plaintiffs' claim of violation of the Trade Act.

*2. False Statement in Advertising Act*

■ ITT Hartford claims that the Advertising Act does not apply to the instant case. It argues that the Advertising Act applies only to advertising or conduct disseminated in Minnesota and, in the instant case, all allegations concern conduct and advertising in Florida. (Def.'s Mem. at 24–25; Def.'s Reply Mem. at 16–17.) The Plaintiffs respond that the statements by the sales agents in Florida were "systematically designed, orchestrated, promulgated and disseminated as part of a uniform scheme originating in ITT Hartford's home office in Minnesota." (Pl.'s Mem. at 39.) They do not, however, argue that any of the statements in question were made or disseminated to the public in Minnesota, and argue mainly that application of Minnesota law to ITT Hartford would not be unjust.

The Court finds that the Plaintiffs have failed to show how the conduct or statements of ITT Hartford fit within the parameters of

---

**16.** The relevant sections of the Trade Act provide that:

> A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:
> (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have; [or]
> (9) advertises goods or services with intent not to sell them as advertised[.]

Minn.Stat. § 325D.44, subds. 1(5), 1(9).

**17.** The relevant sections of the Trade Act provide that:

> A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:
> (2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;
> (3) causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another; [or]
> (13) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

Minn.Stat. § 325D.44, subds. 1(2), 1(3), 1(13).

the Advertising Act. The Advertising Act provides, in relevant part, that:

> Any person, firm, corporation, or association who, with intent to sell or in anywise dispose of merchandise, securities, service, or anything offered by such person, firm, corporation, or association, directly or indirectly, to the public, for sale or distribution, ... or to induce the public in any manner to enter into any obligation relating thereto, ... makes, publishes, disseminates, circulates, or places before the public, or causes, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public, *in this state*, in a newspaper or other publication, ... or in any other way, and advertisement of any sort ..., which advertisement contains any material assertion, representation, or statement of fact which is untrue, deceptive, or misleading shall ... be guilty of a misdemeanor ....

Minn.Stat. § 325F.67 (1998) (emphasis added). The only statements by ITT Hartford that the Plaintiffs have alleged were "made, published, disseminated, circulated, or placed before the public" in Florida; the Plaintiffs have alleged no such statements occurring in Minnesota. The Plaintiffs argue that the statements about which they complain fall within the purview of the statute because Defendant ITT Hartford Life and Annuity Insurance Company maintains its administrative office in Minnesota, and "effected its scheme from the Minnesota home office." (Compl. ¶ 12; Pls.' Mem. at 39.) This rather tortured argument fails to convince the Court; the plain language of the statute requires that the statements be made in Minnesota. Because there is no set of facts consistent with the pleadings under which the Plaintiffs could satisfy this requirement, the Court finds that they have failed to state a claim upon which relief can be granted pursuant to Minn.Stat. § 325F.67. Accordingly, the Court will grant ITT Hartford's Motion with regard to the Plaintiffs' claim under the Advertising Act.

**18.** After *Boubelik,* the Minnesota Legislature amended § 325F.68, subd. 2 to expressly include

### 3. Consumer Fraud Act

ITT Hartford argues that the Fraud Act does not apply because the Fraud Act has never been applied to an insurance contract. They argue that an insurance policy cannot be classified as "merchandise" and thereby come within the scope of the Fraud Act. (Def.'s Supp. Mem. at 26 n.17; Def.'s Reply Mem. at 17.) The Plaintiffs cite to various other jurisdictions that have found insurance policies to be within the scope of similar statutes. (Pls.' Opp'n Mem. at 41–42.)

Minnesota's Consumer Fraud Act applies to any "objects, wares, goods, commodities, intangibles, real estate, loans, or services." Minn.Stat. § 325F.68 (1998). ITT Hartford argues that insurance does not come within the scope of this definition and, therefore, the Consumer Fraud Act is inapplicable to the instant case. (Def.'s Supp. Mem. at 26 n.17; Def.'s Reply Mem. at 17.) In support of this argument, ITT Hartford relies on a Minnesota case which held that loan contracts were outside of the scope of the Act (prior to its amendment to specifically include "loans"), and a Vermont case which held that insurance was not a "good" or "service" within the scope of that state's consumer fraud statute. *See Boubelik v. Liberty State Bank,* 553 N.W.2d 393, 403 (Minn.1996); *Wilder v. Aetna Life & Cas. Ins. Co.,* 140 Vt. 16, 433 A.2d 309, 310 (1981).

The court in *Boubelik* considered the issue of whether Minnesota's Consumer Fraud Act applied to bank loans. At the time, the Act defined "merchandise" as "any objects, wares, goods, commodities, intangibles, real estate, or services." Minn.Stat. § 325F.68, subd. 2.[18] The court held that bank loans were not covered by the Act, because the Legislature did not specifically include bank loans in the definition of "merchandise," and the loans did not fall within the meaning of either "intangibles" or "services." *Boubelik,* 553 N.W.2d at 402–03. In reaching this conclusion, the court cited a federal case from Minnesota which held that loans of money are not "sales," subject to the unfair trade practices provision of the Clayton Act, be-

loans within the meaning of the term "merchandise."

cause "[o]ne does not 'sell' money in the usual business sense." *United States v. Investors Diversified Services, Inc.,* 102 F.Supp. 645, 647 (D.Minn.1951). Relying on this reasoning, the *Boubelik* court held that to include loans in the scope of the Consumer Fraud Act would "extend the policy of consumer protection beyond the language of the statute" and would require the court to "invade the province of the legislature." *Boubelik,* 553 N.W.2d at 403.

While instructive, *Boubelik* does not control the instant case. Unlike money, one does sell insurance in the usual business sense. The Minnesota Supreme Court has held that, because "merchandise" is defined as including both "commodities" and "intangibles," the Act applies to the sale of investment contracts. *Jenson v. Touche Ross & Co.,* 335 N.W.2d 720, 728 (Minn.1983). The Court finds *Jenson* to be more persuasive than *Boubelik* on this issue and, in accord with the majority of other jurisdictions that have considered this issue with regard to similarly worded statutes, holds that the Consumer Fraud Act does apply to the sale of insurance. *See Lemelledo v. Beneficial Management Corp. of America,* 150 N.J. 255, 696 A.2d 546, 551 (1997) (holding that the sale of insurance policies came within the purview of the New Jersey Consumer Fraud Act even though the Act did not specifically include it, and explaining that, "[g]iven that the fertility of human invention in devising new schemes of fraud, the CFA could not possibly enumerate all, or even most, of the areas and practices that it covers without severely retarding its broad remedial power to root out fraud in its myriad, nefarious manifestations."); *see also* Brian H. Redmond, J.D., Annotation, *Coverage of insurance transactions under state consumer protection statutes,* 77 A.L.R.4th 991, §§ 4[a], 4[b] (collecting cases and showing that the weight of authority holds that the sale of insurance policies comes within the scope of states' consumer fraud statutes).

Because Minnesota's Consumer Fraud Act can be read to encompass the sale of insurance policies, the Court finds that ITT Hartford has not shown that the Plaintiffs have failed to state a claim upon which relief could be granted. Accordingly, the Court will deny ITT Hartford's Motion to Dismiss, with regard to the Plaintiffs' claim under the Consumer Fraud Act.

### E. Statutes of Limitation

█ ITT Hartford argues that all of the Plaintiffs' claims are barred by the applicable statutes of limitation and should therefore be dismissed on this ground. (Def.'s Supp. Mem. at 27–31; Def.'s Reply Mem. at 18–19.) The parties agree that each of the Plaintiffs' claims is subject to a six-year limitations period. (Def.'s Reply Mem. at 18; Pls.' Opp'n Mem. at 43–50.) The gravamen of ITT Hartford's argument is that the Plaintiffs knew or should have known the truth about their insurance policies when they received the written policies and illustrations,[19] and that the limitations period began to run at that time. ITT Hartford urges this Court to hold that, as a matter of law, the Plaintiffs knew or should have known that they had purchased life insurance and that the performance was not guaranteed in the manner that they had been led to believe, at the time that they received the written policies. (Defs.' Supp. Mem. at 27–31.) Because of the allegations of fraud and breach of fiduciary duty on the part of ITT Hartford, the Court declines to make this determination as a matter of law.

In *Holstad v. Southwestern Porcelain, Inc.,* 421 N.W.2d 371 (Minn.Ct.App.1988), the Minnesota Court of Appeals addressed the issue of fraudulent concealment and its effect on the applicable statute of limitations:

A defendant fraudulently conceals a cause of action if it knows its representations are false or makes representations with reckless disregard for the truth. Fraudulent concealment, if it occurs, will toll the running of the statute of limitations until

---

**19.** As the Court explained in footnote 4, *supra,* consideration of the illustrations submitted by ITT Hartford would be inappropriate in the instant Motion. However, the Court has considered the written policies referred to in the Complaint, and the Court assumes that ITT Hartford's argument regarding the statutes of limitation remains the same, notwithstanding the Court's decision about the policy illustrations.

discovery or reasonable opportunity for discovery of the cause of action by the exercise of due diligence.

*Holstad,* 421 N.W.2d at 374 (citations omitted). The allegations of fraud raise issues of fact that are not amenable to disposition on a motion to dismiss for failure to state a claim on which relief can be granted. Accordingly, the Court rejects ITT Hartford's arguments regarding the applicable statutes of limitation, and it will deny its Motion on this ground.

### F. Equitable Relief

Finally, ITT Hartford argues that the Court should dismiss the Plaintiffs' claims for Unjust Enrichment, Declaratory and Injunctive Relief, and Reformation. (Eleventh, Twelfth, and Thirteenth Causes of Action (Compl. ¶¶ 174–91).) Because the Plaintiffs cannot prove any underlying fraud or breach, argues ITT Hartford, they cannot state claims for equitable relief. (Def.'s Supp. Mem. at 26.) The Court's resolution of the instant Motion, however, renders ITT Hartford's argument moot. Because the Plaintiffs have stated claims for, *inter alia,* fraudulent inducement and breach of contract, the claims for equitable relief will likewise survive this Motion to Dismiss.[20] Accordingly, the Court will deny ITT Hartford's Motion with regard to the Plaintiffs' claims for equitable relief.

### Conclusion

For the foregoing reasons, and based upon all of the files, records and proceedings herein, **IT IS ORDERED** that Defendants ITT Hartford Life and Annuity Insurance Company's and Hartford Life Insurance Company's Motion to Dismiss (Doc. No. 28) is **GRANTED IN PART**, with respect to the Plaintiffs' claims for Fraud, Fraudulent Concealment, and Deceit (First Cause of Action); Constructive Fraud (Third Cause of Action); Negligent Misrepresentation (Sixth Cause of Action); Negligence (Seventh Cause of Action); and Violations of the Minnesota False Statement in Advertising Act (Ninth Cause of Action); and these claims are **DISMISSED WITH PREJUDICE. IT IS FURTHER ORDERED** that the Defendants' Motion to Dismiss is **DENIED IN PART**, with respect to the Plaintiffs' claims for Fraudulent Inducement (Second Cause of Action); Breach of Fiduciary Duty (Third Cause of Action); Breach of Contract (Fourth Cause of Action); Breach of the Implied Covenant of Good Faith and Fair Dealing (Fifth Cause of Action); Deceptive Practices in Violation of Minnesota Statutes §§ 325D.43 to 325D.48 (Eighth Cause of Action); Consumer Fraud in Violation of Minnesota Statutes §§ 325F.68 to 325F.70 (Tenth Cause of Action); Unjust Enrichment (Eleventh Cause of Action); Declaratory and Injunctive Relief (Twelfth Cause of Action); and Reformation (Thirteenth Cause of Action).

---

**20.** ITT Hartford further states that the Plaintiffs' claim for Unjust Enrichment must be dismissed because this remedy is unavailable "where there exists a valid written contract governing the rights between the parties." (Def.'s Supp. Mem. at 26 n.18.) Of course, while ITT Hartford may be correct in this assertion, the issue of whether such a contract exists in the instant case is precisely one of the matters in dispute.