Mark CUNNINGHAM, et al., Individually and On Behalf of All Others Similarly Situated, Plaintiffs,

v.

PFL LIFE INSURANCE COMPANY, et al., Defendants.

No. C 98–67 MJM.

United States District Court, N.D. Iowa, Cedar Rapids Division.

April 7, 1999.

---

Roger T. Stetson, Michael R. Reck, Belin Lamson McCormick Zumbach Flynn, Des Moines, IA, Judy S. Hoyer, Terry Alan Smiljanich, W. Christian Hoyer, James Hoyer Newcomer Forizs & Smiljanich, PA, Tampa, FL, Ronald R. Parry, Arnzen Parry & Wentz, PSC, Covington, KY, John J. Stoia, Jr., Andrew W. Hutton, Milberg Weiss Bershad Hynes & Lerach LLP, San Diego, CA, Stephen L. Hubbard, Robert W. Biederman, Hubbard & Biederman, LLP, Dallas, TX, for plaintiffs.

Christopher L. Bruns, Patrick M. Roby, Elderkin Law Firm, Cedar Rapids, IA, Lisa Martin, Charles Newman, Bryan Cave, LLP, St. Louis, MO, for defendants.

## ORDER

MELLOY, Chief Judge.

Before the Court is a resisted motion to dismiss pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. The Defendants, AEGON USA, Inc. ("AEGON"), PFL Life Insurance Company ("PFL"), Banker's United Life Assurance Company ("Banker's"), and Life Investor's Company of America ("Life Investor's") (collectively, "AEGON and its subsidiaries" or "the Defendants") filed the motion to dismiss on December 27, 1997. (Doc. 28.) Plaintiffs Mark Cunningham, Jill Cunningham, Mary McKever, and Linda Boyd, individually and on behalf of all others similarly situated[1] ("the Plaintiffs") filed an eight-count complaint in the U.S. District Court for the Middle District of Florida alleging that AEGON and its subsidiaries fraudulently marketed and sold life insurance policies in violation of federal and state law. (Doc. 1.) The Plaintiffs later amended their complaint and added several claims.[2] The Plaintiffs maintain that AEGON misrepresented the life insurance policies to potential purchasers, describing the insurance policies as "retirement plans," "savings plans," or "investment plans." (Doc. 13, at ¶ 6.)

AEGON and its subsidiaries moved to dismiss the amended complaint while the case was proceeding in federal court in Florida.[3] (Doc. 27.) After the motion to dismiss was filed, Judge Mayberry transferred the case from the Middle District of Florida to the Northern District of Iowa pursuant to 28 U.S.C. § 1404(a) ("For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.") (Doc. 47, Transfer Or-

---

1. The Plaintiffs have filed the lawsuit as a putative nationwide class action. The complaint is styled as a "Class Action Complaint," but no class certification motion has been filed at this point. Accordingly, the Court will only consider the allegations of the named plaintiffs.

2. The Plaintiffs' amended complaint includes the following claims: (1) a claim under the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"); (2) conspiracy; (3) common law fraud; (4) breach of fiduciary duty; (5) reckless and wanton failure to train and supervise; (6) negligent misrepresentation; (7) breach of duty of good faith and fair dealing; (8) unjust enrichment; (9) declaratory and injunctive relief; and (10) punitive damages. (First Amended Class Action Complaint, Doc. 13.)

3. Since the motion to dismiss and the Plaintiffs' resistance were filed while the case was pending in federal court in Florida, the parties' briefs are based on Florida law. (Doc. 28, Mem. In Supp. Of Def.'s Mot. To Dismiss; Doc. 36, Pla.'s Mem. Of Law in Oppos. to Def.'s Mot. to Dismiss.) The Plaintiffs, however, filed a supplemental brief addressing the issues under Iowa law. (Doc. 87.) The nature of the transfer and the diversity of the parties raise conflict of law questions discussed *infra*.

der.) The Court heard oral argument on October 27, 1998. (Doc. 111, Trans. Of Oral Arg.) Although the parties are conducting discovery on the issue of class certification,[4] the Court is now ready to decide the motion to dismiss on the merits.

## I. BACKGROUND

The Plaintiffs in this putative class action allege that from January 1, 1990 to December 31, 1996, AEGON and its subsidiaries engaged in a "systematic scheme of marketing fraud" in which PFL agents unlawfully induced consumers to purchase certain types of whole life insurance policies. The complaint alleges that AEGON and its subsidiaries intentionally developed a fraudulent marketing and sales scheme in which insurance agents would market and sell insurance policies. The agents would disingenuously describe the product that they were selling as an investment vehicle similar to a mutual fund or an Individual Retirement Account. The complaint alleges that the Defendants intentionally concealed the fact that the Plaintiffs were actually purchasing a life insurance policy.

AEGON and its subsidiaries furthered the fraudulent scheme through telephone marketing, sales materials, agent manuals, training scripts, training videos, direct mailings, and face-to-face sales presentations with prospective purchasers.[5] The Plaintiffs maintain that AEGON and its subsidiaries instructed their insurance agents to mischaracterized the life insurance policies in a number of different ways: PFL agents told prospective purchasers that they were selling "retirement plans," "savings plans," "pension plans," "college funding programs" or "college savings plans." The insurance agents referred to payments that the Plaintiffs were required to make as "deposits." AEGON and its subsidiaries specifically instructed the agents to tell prospective policyowners

that they were not selling life insurance. Additionally, the insurance agents referred to themselves as "enrollers," "counselors," and "representatives." The Plaintiffs' complaint also exhaustively details the status of investigations by several state insurance agencies into the marketing and sales schemes. Each putative class representative experienced a slightly different marketing and sales approach.

### A. Plaintiff Mary McKever

In May 1994, Plaintiff Mary McKever, a citizen of Florida, received an unsolicited visit from a PFL agent, Sandra Cullimore, who claimed to be the president of Collegiate Funding of Florida. (Doc. 13, at ¶ 32.) Agent Cullimore never informed McKever that she was a life insurance agent. Instead, Agent Cullimore described a "College Savings Program" that would cost $100 per month and would provide $1,200 in cash plus interest after one year which could be withdrawn to finance her daughter's education. Agent Cullimore also provided McKever with the names of parties that would provide information on grants and college loans. Agent Cullimore stated that she was not offering McKever life insurance, but rather a college savings plan. Agent Cullimore never discussed the fact that McKever was purchasing a life insurance policy, and McKever was never required to take a physical examination.

PFL did not provide McKever with a copy of the plan until eight months after Agent Cullimore's initial visit. Agent Cullimore instructed McKever to immediately file the plan away in a safe place. When McKever reviewed the plan, she learned that she had purchased a $42,000 flexible premium life insurance life insurance policy. McKever was told that the only way she could withdraw any "college savings" was to borrow against the life insurance

---

4. The hearing on the class certification issue is set for May 28, 1999. (Doc. 134.)

5. The Plaintiffs have attached to the complaint sales and marketing materials that AE-

GON and its subsidiaries used to further the scheme. The materials include standardized sales presentations, sales scripts, and sales brochures describing, *inter alia,* the "retirement plans" and "college savings plans."

policy or surrender the policy and pay substantial surrender charges.

McKever's policy lapsed in May 1995 due to nonpayment. McKever forfeited the $1,000 she believed that she had invested in the College Savings Program. As a result of Agent Cullimore's obfuscation regarding the life insurance, McKever's daughter was forced to delay her college enrollment.

### B. Plaintiff Linda Boyd

Linda Boyd, a registered nurse and a citizen of Florida, was approached by Brad Ritch in September 1988 to discuss a "Nurses Retirement Plan" underwritten by PFL. (Doc. 13, at ¶ 37.) Agent Rich presented Boyd with a brochure and an illustration detailing the specifics of the plan: PFL would automatically make monthly withdrawals of $50 from Boyd's bank account. After twenty years, Boyd would accumulate $48,000 from which she could make unlimited withdrawals to use as retirement income. Agent Ritch never informed Boyd that the retirement plan involved the purchase of life insurance or that the investment plan was subject to substantial commissions and other service charges.

Another PFL life insurance agent, Larry Heaton, prepared "proposed updates" to the Nurses Retirement Plan in order to increase the amount of automatic withdrawals as Ms. Boyd's salary increased. The updates were actually additional life insurance policies issued in September 1990 and January 1993. Finally, a financial planner informed Boyd that she had not purchased a retirement plan, but rather a series of life insurance policies. As a result of the information, Boyd surrendered her policy in 1995 and incurred surrender charges and lost significant investment income.

### C. Mark and Jill Cunningham

In January 1993, Mark and Jill Cunningham, citizens of Missouri, informed a PFL agent that they had an interest in setting money aside in a retirement fund. (Doc. 13, at ¶ 41.) The PFL agent proposed a "retirement plan" or "pension plan" called the "Flexible Asset Builder." The Agent told the Cunninghams that the primary benefit of the Flexible Asset Builder was its investment component. The insurance agent also stated that PFL was very strong financially and had its parent company's (AEGON USA) financial backing. The Cunninghams later discovered that they had unintentionally purchased life insurance and not a "retirement plan" or "pension plan." [6]

## II. ANALYSIS

### A. Standard of Review

A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts consistent with the allegations of the complaint. *Hishon v. King & Spalding,* 467 U.S. 69, 71, 104 S.Ct. 2229, 81 L.Ed.2d 59 (U.S.1984). Allegations should be construed in favor of the pleader. *Albright v. Oliver,* 510 U.S. 266, 114 S.Ct. 807, 810, 127 L.Ed.2d 114 (1994). At the very least, however, the complaint must contain facts which state a claim as a matter of law and the substance of the complaint must not be conclusory. *Frey v. City of Herculaneum,* 44 F.3d 667, 671 (8th Cir.1995); *Municipal Utils. Board v. Alabama Power Co.,* 925 F.2d 1385, 1390 (11th Cir.1991).

### B. Choice of Law

 When a case is transferred pursuant to § 1404(a), the transferee court must apply the choice of law rules of the transferor court. *See Ferens v. John Deere Co.,* 494 U.S. 516, 521–22, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990); *Wisland v. Admiral Beverage Corp.,* 119 F.3d 733, 735–36 (8th Cir.1997). A § 1404(a) transfer entitles litigants to a change in court-

---

**6.** The Plaintiffs have moved to join Rosemary Breland pursuant to Fed.R.Civ.P. 20 (permissive joinder of parties). That motion is pending before Chief Magistrate Judge Jarvey. Accordingly, the Court will not include Breland in its analysis of the motion to dismiss.

rooms, not a change of substantive law. 17 James Wm. Moore et al., Moore's Federal Practice § 124.30[2][a] (Matthew Bender 3d ed.). Since the case was originally filed in Florida, this Court must apply Florida's choice of law rules. *See Ferens*, 494 U.S. at 521–22, 110 S.Ct. 1274.

■ Under Florida's choice of law rules, a court makes a separate choice of law determination with respect to each particular issue under consideration. *Trumpet Vine Investments, N.V., v. Union Capital Partners I, Inc.*, 92 F.3d 1110, 1115 (11th Cir.1996). Since the Plaintiffs have raised a number of claims, the Court will address each choice of law question as it addresses merits of each claim.

### 1. RICO (Count 1)

The Plaintiffs maintain that insurance agents working for AEGON and its subsidiaries committed numerous violations of the mail fraud statute (18 U.S.C. § 1341) and the wire fraud statute (18 U.S.C. § 1343). The Plaintiffs assert that the violations constitute a pattern of racketeering activity in violation of the federal civil RICO statute, 18 U.S.C. §§ 1961 et seq. (1998).

According to the Plaintiffs, AEGON's agents and other representatives made thousands of telephone calls, mailed thousands of documents, and initiated thousands of wire transfers to different banks to further the fraudulent insurance scheme. However, AEGON and its subsidiaries assert that the Plaintiffs' RICO claim fails to state a claim because (1) the RICO claim is barred by the McCarran–Ferguson Act; (2) the Plaintiffs lack standing to bring a RICO claim; and (3) the Plaintiffs' injury was not proximately caused by the mail fraud and wire fraud.

■ Section 1962(c) of the RICO Act makes it "unlawful for any person employed by or associated with any enterprise engaged in ... interstate ... commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Subsection (d) criminal-

izes a conspiracy to violate one of the other subsections of § 1962. Section 1964(c) allows a private party, who has been injured in his property from a RICO violation, to sue for damages. To state a RICO claim, the Plaintiffs must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (footnote omitted).

#### a. McCarran–Ferguson Act

■ The relevant portion of McCarran–Ferguson states that "no Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any state for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b) (1998). In its moving papers, AEGON and its subsidiaries persuasively argued that McCarran–Ferguson and the "business of insurance" defense barred the Plaintiffs' RICO claim. *See Doe v. Norwest Bank Minnesota, N.A.*, 107 F.3d 1297, (8th Cir.1997) (holding that a RICO claim was precluded by McCarran–Ferguson because Minnesota's regulatory scheme would be impaired if RICO claim allowed to go forward). Indeed, the Plaintiffs effectively conceded that their RICO claim was meritless when they failed to address RICO in their resistance. (Doc. 87.) However, at oral argument, the Plaintiffs directed the Court's attention to a potentially dispositive Ninth Circuit case which, at the time, was pending in the Supreme Court. *See Forsyth v. Humana*, 114 F.3d 1467 (9th Cir.1997), *affirmed*, —— U.S. ——, 119 S.Ct. 710, 142 L.Ed.2d 753 (1998). While AEGON's motion to dismiss was pending in this Court, the Supreme Court issued a decision in *Humana, Inc. v. Forsyth*, —— U.S. ——, 119 S.Ct. 710, 142 L.Ed.2d 753 (1999).

In *Humana*, the Supreme Court held that McCarran–Ferguson did not bar a RICO claim asserted by a group of health insurance purchasers against a health in-

surer. *Humana,* — U.S. at ——, 119 S.Ct. at 716. The Court stated that allowing RICO claims to proceed against an insurer did not "impair" the state insurance regulatory framework because RICO and the state law were not in direct conflict. *Id.* The Court also stated that insurance companies could comply with both RICO and state insurance law without violating either set of laws. *Id.* In the absence of a conflict, the Court stated that McCarran–Ferguson did not apply and did not preclude the claim under RICO. *Id.*

Soon after the Supreme Court handed down the *Humana* decision, this Court requested the parties to submit briefs on the effects of the decision on the Plaintiffs' civil RICO claim in this case. (Order, Doc. 125.) In the response that AEGON and its subsidiaries submitted, the Defendants acknowledged that *Humana* overruled the cases they had earlier cited (e.g., *Norwest Minnesota Bank, supra*). The Defendants also acknowledged that the Supreme Court decision eliminated the "business of insurance" defense they had earlier asserted. (Doc. 126.)

In light of the *Humana* decision, this Court finds that McCarran–Ferguson does not bar the Plaintiffs' RICO claim in this case. Nonetheless, AEGON and its subsidiaries maintian that the Plaintiffs' RICO claim should still be dismissed under Rule 12(b)(6). AEGON and its subsidiaries assert that the Plaintiffs lack standing under RICO, and the Plaintiffs' injury was not proximately caused by mail fraud and wire fraud allegedly committed by AEGON and its subsidiaries. (Doc. 126.)

As the record now stands, the Plaintiffs have never resisted the motion to dismiss on the standing issue or the proximate cause issue. The Plaintiffs' failure to brief the issues is to be expected. In its pre-*Humana* resistance, after AEGON and its subsidiaries convincingly argued that the RICO claim was barred by McCarran–Ferguson, the Plaintiffs' conceded the RICO claim. Only at oral argument did the Plaintiffs argue that the RICO claim still warranted the Court's consideration,

and only then because a dispositive case was pending in the Supreme Court. In the post-*Humana* brief the Plaintiffs submitted at the Court's urging, the Plaintiffs only addressed the effects of McCarran–Ferguson. Consequently, the Plaintiffs have never offered a substantive discussion on the standing or proximate cause issues.

The Court is reluctant to dismiss the RICO claim before both sides are afforded an opportunity to squarely address the relevant issues. *See Editek v. Morgan Capital, L.L.C.,* 150 F.3d 830, 832 (8th Cir.1998) ("Dismissal under 12(b)(6) is proper only if it is clear that no relief can be granted under any set of facts that could be proved consistent with the allegations."). Accordingly, the Court will deny the motion to dismiss without prejudice at this time with the understanding that AEGON and its subsidiaries are free to renew the motion to dismiss or bring a motion for summary judgment later in the proceedings.

### 2. Conspiracy (Count 2)

Next, the Plaintiffs allege that AEGON and its subsidiaries conspired to "commit the independent wrongful overt acts complained of above and to violate § 1961 of RICO ..." The Plaintiffs have failed to clearly articulate the underlying tort on which they base their conspiracy claim. Presumably, the Plaintiffs intended to bring claims for conspiracy to commit RICO, fraud, breach of fiduciary duty, and the other claims listed in the First Amended Class Action Complaint. (Doc. 13.)

The Supreme Court of Florida has adopted the "most significant relationships test" set forth in the Restatement (Second) of Conflict of Laws § 145 to determine the choice of law in tort claims. *Trumpet Vine,* 92 F.3d at 1116 (citing *Bishop v. Florida Specialty Paint Co.,* 389 So.2d 999, 1001 (Fla.1980)). The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship

to the occurrence and the parties under the principles stated in § 6 of the Restatement (Second) of Conflict of Laws.[7]

■ When applying the principles of § 6 to determine the law applicable to an issue, the Court must take into account the following contacts: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered. *Trumpet Vine*, 92 F.3d at 1116.

In their motion to transfer, the Defendants stated that "the Northern District of Iowa has far more contacts with this case than does the Middle District of Florida." (Doc. 21.) However, the Defendants have changed their position in the context of the choice-of-law determination. The Defendants' evolving position is exemplified in their moving papers urging the Court to apply Florida or Missouri law to this case: when "the crux of the allegations relate to a policy sold in another jurisdiction by an agent in that jurisdiction to a resident of that jurisdiction, Iowa applies the law of that jurisdiction rather than its own law." (Doc. 106, at 3.) The Plaintiffs assert that Judge Pratt's ruling applying Iowa law in a similar case, *Grove v. Principal Mutual Life Ins., Co.*, 14 F.Supp.2d 1101, 1105 (S.D.Iowa 1998), is apposite to this case.

In *Grove*, the district court applied a "most significant relationships test" to a substantially similar set of facts. An insurance agent approached the Florida Plaintiffs in the state of Florida and persuaded them to purchase insurance policies. However, the defendant (Principal)

was incorporated in Iowa; had its principal place of business in Iowa; the insurance policies were underwritten in Iowa; and the sales presentations were designed in Iowa. Additionally, the fraudulent scheme was hatched in Iowa. Finally, the named Plaintiffs in *Grove* resided in different states (Florida and Louisiana). The Court concluded that Iowa had the most significant contacts with the tortious conduct, thus, Iowa law applied. *Grove*, 14 F.Supp.2d at 1106–07.

■ Initially, it is important to note that at this point in the litigation, the Court has not certified the Plaintiffs as class representatives. Accordingly, the Court will not make a choice of law determination that will bind the putative class in this Order. This Order only contemplates the claims of the named Plaintiffs: McKever and Boyd (from Florida) and the Cunninghams (from Missouri).

Although the Plaintiffs purchased the insurance in Florida and Missouri, a substantial portion of the fraudulent conduct occurred in Iowa. The principal place of business for AEGON and its subsidiaries involved in the scheme is Cedar Rapids, Iowa, and all of the Defendants are Iowa corporations. (Doc. 21, at 2.) The marketing and sales scheme originated in the corporate offices of AEGON and its subsidiaries in Cedar Rapids. *Id.* The management-level decisions and policies pertaining to sales practices issued from Iowa. (Doc. 47.) Iowa's interest in regulating the manner in which Iowa insurance companies do business is clear. Finally, the Court notes that as in *Grove*, the Plaintiffs are residents of different states. Since the contacts are split between two states

7. Section 6 provides:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

· (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

(Florida and Missouri), the contacts with Iowa become even more significant, and the importance of the non-Iowa contacts is diluted. This list of contacts provides compelling evidence that favors the application of Iowa law. Therefore, the Court will apply Iowa law to the conspiracy claim.

 Under Iowa law, conspiracy does not state an independent cause of action, but rather requires the commission of an underlying wrong for which liability may be extended to an additional defendant by virtue of a conspiracy. *Neff v. World Publishing Co.*, 349 F.2d 235, 257 (8th Cir.1965) (citing *Nelson v. Melvin*, 236 Iowa 604, 19 N.W.2d 685, 687 (1945)). In other words, the conspiracy claim is valid only to the extent that another claim is valid *and* an agreement was made to commit the wrong which forms the basis of the other claim. *Ezzone v. Riccardi*, 525 N.W.2d 388, 397–98 (Iowa 1994).

 AEGON and its subsidiaries assert that the Court must grant the motion to dismiss because a corporation cannot conspire with its subsidiaries or its employees acting within the scope of employment. (See Doc. 28, at 14 (citing Florida cases).) AEGON has not cited, nor can the Court find, any Iowa cases that stand for the proposition that a corporation cannot conspire to commit a common law tort with its subsidiaries or employees. Nonetheless, this Court has recognized the principle of intracorporate immunity in a context outside of a conspiracy to commit a common law tort. *Islami v. Covenant Medical Center*, 822 F.Supp. 1361, 1381 (N.D.Iowa 1992) (antitrust claim).

 Even if this Court were to find that the principle of intracorporate immunity applied to this case, this Court has recognized a "personal gain" exception to the principle. *Islami*, 822 F.Supp. at 1382. When a corporation's agents have an independent stake in achieving the corporations illegal objective of the conspiracy, whether for a personal motive or for personal economic gain, intracorporate immunity does not apply. As the Eighth Circuit has stated, "a corporation cannot engage in an antitrust conspiracy with it agents unless, at the time of the conspiracy, the agent is acting for his or her own benefit." *Islami*, 822 F.Supp. at 1382 (quoting *Victorian House, Inc. v. Fisher Camuto Corp.*, 769 F.2d 466, 469 (8th Cir.1985)). The term "agent's own benefit" is defined to mean at least an economic stake in the gain to be realized from the anticompetitive object of the conspiracy. *Id.* (quoting *Pink Supply Corp. v. Hiebert, Inc.*, 788 F.2d 1313, 1317–18 (8th Cir.1986)).

In the instant case, the alleged conspirators are AEGON, its subsidiaries, and the insurance agents that sold policies to the Plaintiffs. While at first glance it appears that the case involves an intracorporate conspiracy, it is possible that the insurance agents and perhaps even the subsidiaries conspired against the Paintiffs for their own personal gain. The agents could have increased their sales commissions and the subsidiaries could have garnered additional compensatory benefit from the conspiracy to defraud the Paintiffs. Such a set of facts would entitle the Paintiffs to escape dismissal because of the intracorporate immunity doctrine. *See Pink Supply*, 788 F.2d at 1317 (antitrust claim); *Islami*, 822 F.Supp. at 1382 (antitrust claim); *Girard v. 94th St. & Fifth Ave. Corp.*, 530 F.2d 66, 72 (2d Cir.1976) (constitutional tort); *Roniger v. McCall*, 22 F.Supp.2d 156, 157 (S.D.N.Y.1998) (constitutional tort). Accordingly, it would be premature to find that the intracorporate immunity doctrine precludes the Paintiffs' conspiracy claim. It is not clear that the Plaintiffs could prove no set of facts showing that the agents or subsidiaries acted for their own personal gain. The Court will not dismiss the Plaintiffs' conspiracy claim on the basis of intracorporate immunity.[8]

---

**8.** Of course, the conspiracy claims are only valid if the underlying claim is valid. *See* discussion *supra*.

### 3. Common Law Fraud (Count III)

AEGON and its subsidiaries assert that the Plaintiffs' common law fraud claim should be dismissed for failure to state a claim because (1) the Plaintiffs' claim fails to meet the pleading requirements of Fed. R.Civ.P. 9(b), (2) the Plaintiffs' fraud claim fails to allege sufficient facts to state a cause of action, (3) the "economic loss rule" bars the Plaintiffs' claim, and (4) the Plaintiffs' allegations of reasonable reliance fail as a matter of law. (Doc. 28, at 19; Doc. 83, at 8.) Predictably, the Plaintiffs maintain that they have satisfied Rule 9(b), their fraud claim states a viable cause of action, the economic loss rule does not apply to this case, and they have adequately plead reliance. (Doc. 87, at 11.)

 Florida has adopted § 148 of the Restatement (Second) of Conflict of Laws which provides choice of law principles for fraud and misrepresentation. *Trumpet Vine*, 92 F.3d at 1118. Section 148(1) states that the Court should apply the law of the state where the false representations were made and received unless, "with respect to a particular issue, some other state has a more significant relationship to the transaction." Restatement (Second) of Conflicts of Law § 148(1) (1971). As in the previous section of this Order, of the three states with contacts to the alleged fraudulent transaction, Iowa has the most relationship to the fraud. Thus, the Court will apply Iowa law.

#### a. Rule 9(b)

 In a diversity case, although the court applies the applicable state substantive law, the Federal Rules of Civil Procedure generally govern. *Hanna v. Plumer*, 380 U.S. 460, 465, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965); 2 Moore's Federal Practice § 9.03(1)(E) (Matthew Bender 3d ed.). Therefore, in accordance with Rule 9(b), the Court must decide whether Plaintiff's complaint averring fraud is "stated with particularity." When pleading fraud, Plaintiffs cannot simply make conclusory allegations. *See Commercial Prop. Invs., Inc. v. Quality Inns Int'l*, 61 F.3d 639, 644

(8th Cir.1995). The Court will look at the following factors to determine whether the claim was plead properly: the time, place, and contents of the alleged fraud; the identity of the person allegedly committing fraud; and what was given up or obtained by the alleged fraud. *Id.* at 644 (citing *Bennett v. Berg*, 685 F.2d 1053, 1062 (8th Cir.1982)). A Plaintiff need not show each factor to plead fraud with sufficient particularity. Instead, a Plaintiff must state enough so that the pleadings are not merely conclusory. *Roberts v. Francis*, 128 F.3d 647, 651 n. 5 (8th Cir.1997).

 The Plaintiffs' lengthy First Amended Class Action Amended Complaint (Doc. 13.) includes an exhaustive description of the alleged fraudulent conduct. Contrary to assertions in AEGON's and its subsidiaries' motion to dismiss, the complaint lists *inter alia* the insurance agents that approached each named Plaintiff, the company for whom the agent worked, the type of policy each Plaintiff purchased, and the purchasers of the policies. (*Id.* at ¶¶ 32–41.) Additionally, the Plaintiffs also detailed in their complaint the amount of money each had invested in the policies. In light of these factors, the Court finds that the Plaintiffs have not filed a conclusory complaint. AEGON and its subsidiaries have more than enough information to ascertain the nature of the common law fraud claims against them and the grounds on which they are based. Therefore, the Court finds that the Plaintiffs sufficiently complied with the pleading requirements of Rule 9(b).

#### b. Failure to Plead Sufficient Facts

 Next, AEGON and its subsidiaries assert that the Plaintiffs' claim fails to state sufficient facts to state a cause of action for common law fraud. To prove fraudulent misrepresentation, the Plaintiffs must prove that AEGON and its subsidiaries: (1) made a false statement concerning an existing material fact; (2) knew that the representation was false; (3) intended that the representation induce

Plaintiffs' reliance; and (4) the Plaintiffs suffered injury after acting in reliance on the misrepresentation. *Hyler v. Garner*, 548 N.W.2d 864, 870 (Iowa 1996). Specifically, AEGON and its subsidiaries maintain that the complaint fails to state a claim because the first, second, and fourth elements are not sufficiently alleged. (Doc. 28, at 19.)

■ The Plaintiffs' fraud claims are premised on the allegation that AEGON and its subsidiaries misrepresented their life insurance policies as personal investment vehicles that would perform like individual retirement accounts or mutual funds. The complaint alleges that AEGON and its subsidiaries specifically targeted less sophisticated investors with their scheme. The insurance agents disingenuously called themselves investment counselors. The complaint alleges that the agents and the Defendants intentionally marketed the policies in a misleading manner and intentionally concealed the fact that they were selling life insurance. Finally, the Plaintiffs contend that they were injured.[9]

■ The Court agrees with AEGON and its subsidiaries that mere opinions or judgments are not actionable. *See First National Bank in Lenox v. Brown*, 181 N.W.2d 178, 183 (Iowa 1970). However, where a statement in a business transaction can be viewed as coming from one with superior knowledge of the subject-matter and the statement is made to induce the listener to rely on it, such statement may be deemed a statement of fact rather than opinion. *See Grahek v. Voluntary Hospital Coop. Ass'n*, 473 N.W.2d 31, 35 (Iowa 1991).

■ AEGON's and its subsidiaries' investment counselors held themselves out as professionals with superior knowledge. The written materials provided by the counselors deliberately misled buyers by marketing, for example, "supplemental retirement income plans." The written ma-

terials referred to authoritative documents published by the United States House of Representatives urging individuals to make additional investments to supplement social security thereby cloaking the scheme with the authority of the Congress. The Plaintiffs have sufficiently alleged that AEGON and its subsidiaries knowingly made false and misleading statements. It certainly appears clear that the agents' misrepresentations were intentional since they were instructed to deny that they were selling life insurance. The Plaintiffs also suffered damages specifically detailed in the complaint. Whether the Plaintiffs' reliance on the insurance agents' misrepresentations was reasonable is a question not appropriately resolved on a motion to dismiss. *See Force v. ITT Hartford Life and Annuity Insurance Co.*, 4 F.Supp.2d 843, 850 (D.Minn.1998) (rejecting a 12(b)(6) motion on question of whether reliance was reasonable because "[s]uch a determination hinges on questions of fact."). Since the Plaintiffs have adequately alleged the elements of fraud, the Court will deny AEGON's and its subsidiaries' motion to dismiss.

#### c. The Economic Loss Rule

AEGON and its subsidiaries maintain that the "economic loss doctrine" bars several of the Plaintiffs' claims, including the common law fraud claim. (Doc. 83, at 7.) The Plaintiffs argue that the economic loss doctrine does not apply to this case because their tort claims are "based upon conduct that is separate and distinct from conduct constituting a breach of contract." (Doc. 87, at 12.)

■ The economic loss doctrine prohibits tort recovery for purely economic losses, consigning such claims to contract law. *American Fire and Casualty Co. v. Ford Motor Co.*, 588 N.W.2d 437, 439 (Iowa 1999) (strict liability); *Nelson v. Todd's Ltd.*, 426 N.W.2d 120, 122 (Iowa

---

9. For example, Mary McKever was forced to delay sending her daughter to college when she ascertained that the "college savings plan" she had purchased was deficient. (Doc. 13, at ¶ 32.)

1988) (strict liability and negligence); *Richards v. Midland Brick Sales Co., Inc.,* 551 N.W.2d 649, 651–52 (Iowa App.1996) (strict liability and negligence). It is well-established that a plaintiff who has suffered only economic loss due to another's negligence has not been injured in a manner which is legally cognizable or compensable. *Todd's Ltd.,* 426 N.W.2d at 123. The same rule applies under strict liability. *Id.*

■ In many jurisdictions, claims for fraud are an exception to the economic loss doctrine. *E.g., Fireman's Fund Ins. Co. v. SEC Donohue, Inc.,* 176 Ill.2d 160, 223 Ill.Dec. 424, 679 N.E.2d 1197, 1199 (1997); *City of Richmond, Va. v. Madison Management Group,* 918 F.2d 438, 446–47 (4th Cir.1990) (applying Virginia law); *Formosa Plastics Corp. USA v. Presidio Engineers and Contractors, Inc.,* 960 S.W.2d 41, 46 (Tex.1998); *but see Parkhill v. Minn. Mut. Life Ins. Co.,* 995 F.Supp. 983, 993 (D.Minn.1998) (applying Florida law); *HTP, Ltd. v. Lineas Aereas Costarricenses,* 685 So.2d 1238, · 1239 (Fla.1996).[10] Thus, in a number of jurisdictions, when a plaintiff's damages are proximately caused by a defendant's intentional, false representation, the plaintiff is not barred from recovering economic damages because of the economic loss doctrine. *Fireman's Fund,* 223 Ill.Dec. 424, 679 N.E.2d at 1200.

■ While the Iowa Supreme Court has not explicitly stated that fraud claims are excepted from the economic loss

doctrine, Iowa case law does provide some guidance in the area. In *Midwest Home Distributor, Inc. v. Domco Indus. Ltd.,* 585 N.W.2d 735, 739–41 (Iowa 1998), the Iowa Supreme Court affirmed a jury award on a fraud claim for economic damages in the form of lost profits. Similarly, the Iowa Supreme Court has allowed economic damages in bad-faith claims. *Nassen v. National States Ins. Co.,* 494 N.W.2d 231, 237 (Iowa 1992). Finally, another judge in this district has determined that under Iowa law, the economic loss doctrine does not preclude fraudulent misrepresentation claims. *See Johnson v. Land O' Lakes, Inc.,* 18 F.Supp.2d 985, 1001 (N.D.Iowa 1998) (Bennett, J.). Although Iowa courts have not plainly stated that fraud claims are an exception to the economic loss doctrine, the case law does suggest that if confronted with the question directly, Iowa would articulate that position.

AEGON and its subsidiaries have failed to persuade this Court that the economic loss doctrine precludes the Plaintiffs' common law fraud claim under Iowa law. Accordingly, the motion to dismiss is denied on this point.

### d. Reasonable Reliance

Finally, AEGON and its subsidiaries assert that the Plaintiffs' allegations of reasonable reliance fail as a matter of law. (Doc. 83, at 3–4.) AEGON and its subsidiaries maintain that the documentation provided to the Plaintiffs by AEGON and its subsidiaries were "replete with unam-

---

**10.** Florida does not recognize a blanket fraud exception to the economic loss doctrine. However, courts applying Florida law have recognized a related, yet narrower exception. Thus, in Florida, the economic loss rule does not preclude a cause of action based upon a tort independent of the contractual breach. *AFM Corp. v. Southern Bell Tel. & Tel. Co.,* 515 So.2d 180, 181 (Fla.1987). The Plaintiffs have argued that they fall under Florida's "conduct distinct from the contract" exception. Under Florida's rule, The Plaintiffs' claim for fraudulent inducement would not be barred by the economic loss rule if the alleged fraudulent conduct occurred prior to contract formation and the standard of truthful representation placed upon the defendant is not

derived from the contract. *HTP, Ltd.,* 685 So.2d at 1239; *Force,* 4 F.Supp.2d at 851 (whether fraudulent inducement claim survives economic loss doctrine is determined on a case-by-case basis) (applying Florida law). Additionally, the economic loss rule often does not preclude claims for breach of fiduciary duty under Florida law. *Parkhill,* 995 F.Supp. at 992 n. 12 (listing Florida cases applying the economic loss doctrine to fraudulent inducement claims).

Iowa courts have not expressly recognized Florida's "conduct distinct from the contract" exception. Consequently, this Court believes that the blanket fraud exception is more consistent with Iowa law than the Florida economic loss framework.

biguous references to 'life insurance,' 'insurance,' 'death benefits,' 'premiums.' 'Insured,' 'coverage,' 'beneficiary,' all terms which unequivocally put the Plaintiffs on notice that they were buying life insurance." (*Id.* at 4.) AEGON and its subsidiaries, relying on an unpublished Third Circuit opinion *Solomon v. Guardian Life Ins. Co. of America*, No. 97–2011, slip op. at 9, 1998 WL 547865 (3rd Cir.1998), assert that a policyholder cannot reasonably rely upon sales representations that contradict clear statements in the policy and supporting documentation. While that is an accurate statement of the law, E. Allan Farnsworth, Contracts 474 (2nd Ed.1990), the principle does not apply to the facts of this case.

The Plaintiffs have submitted a multitude of documents which bear out the fact that their reliance was reasonable for the purposes of a motion to dismiss. In the documentation, AEGON and its subsidiaries dressed up their life insurance policies as "college funding programs" and other investment vehicles. AEGON maintains that since the policies included language that identified that the Plaintiffs' were purchasing insurance, their reliance was not reasonable. Yet after the Plaintiffs purchased the policies, the agents told the Plaintiffs to immediately file the policies away in a safe place. The mention of the word "insurance" or "beneficiary" in a written document after a salesman persuasively presents the virtues of a savings or investment plan and then instructs you to file the documentation away does not vitiate reasonable reliance. This is especially true in the context of a motion to dismiss.

At this stage of the proceedings, the Court is hard-pressed to state that the Plaintiffs have failed to plead reasonable reliance as a matter of law. *See Grove*, 14 F.Supp.2d at 1111. Accordingly, the argument that the Plaintiffs' fraud claim should be dismissed because of a lack of reasonable reliance is without merit.

After considering all the arguments advanced by AEGON and its subsidiaries against the Plaintiffs' fraud claims, the Court cannot rule as a matter of law that the fraud claim fails to state a claim on which relief can be granted. Accordingly, the motion to dismiss the claim for fraud (Count III) is denied.

### 4. Breach of Fiduciary Duty (Count IV)

In Count IV of the complaint, the Plaintiffs allege that AEGON and its subsidiaries, through their agents, provided advice and offered counsel on tax deferred investing for retirement. The Plaintiffs maintain that AEGON and its subsidiaries owed a fiduciary duty to fully disclose *inter alia* the nature of the product being sold (life insurance) and the financial effect of the transaction, including fees and expenses relating to the life insurance. (Doc. 13, at ¶ 93.) AEGON and its subsidiaries deny the existence of a fiduciary relationship because, they allege, the transaction occurred at "arms-length." (Doc. 28, at 23.) The Plaintiffs retort that the nature of the insurer-insured relationship contemplates the insured placing trust and confidence in the insurer. Thus, the Plaintiffs claim, a fiduciary relationship is created. (Doc. 87, at 14.)

A claim for breach of fiduciary duty is comparable to a fraud claim for choice of law purposes. *Trumpet Vine*, 92 F.3d at 1116. As was the case for the fraud claims, the state with the most significant relationship to this lawsuit is Iowa. Thus, the Court will apply Iowa law.

Iowa courts will find a fiduciary relationship exists when "there is a reposing of faith, confidence, and trust, and the placing of reliance by one upon the judgment and advice of another." *McCracken v. Edward D. Jones & Co.*, 445 N.W.2d 375, 381 (Iowa App.1989). Because the circumstances giving rise to a fiduciary duty are so diverse, any such relationship must be evaluated on the facts and circumstances of each case. *Kurth v. Van Horn*, 380 N.W.2d 693, 697 (Iowa 1986).

When one party acts as an investment advisor for another party, Iowa

courts are more likely to find a fiduciary relationship. *Kurth,* 380 N.W.2d at 698; *McCracken,* 445 N.W.2d at 381. Additionally, Iowa courts have recognized that insurers have duties to insureds beyond those obligations explicitly stated in their insurance contracts. *Grove,* 14 F.Supp.2d at 1111 (citing *Dolan v. Aid Ins. Co.,* 431 N.W.2d 790, 794 (Iowa 1988)).

 In this case, the insurance agents allegedly introduced themselves as investment counselors or enrollers. The agents tailored the plans for each person depending on the individual's financial position and on the amount each wished to "deposit" in their "investment plan" or "savings plan." The Plaintiffs were asked to provide personal financial information to the agents. No mention was made of the fact that the agents were selling life insurance at the initial consultation. In fact, according to the sales scripts, the agents were instructed to conceal that they were selling life insurance. Consequently, the Plaintiffs were led to believe that the insurance agents were drafting an investment plan suited to each of the Plaintiffs' needs. Such conduct, at least in the context of a motion to dismiss, could be seen as giving rise to a fiduciary duty. Accordingly, the motion to dismiss the breach of fiduciary duty claim is denied.

### 5. Reckless and Wanton Failure to Train and Supervise (Count V)

The Plaintiffs allege in Count V that AEGON and its subsidiaries recklessly and wantonly failed to properly train and supervise their insurance agents. The Plaintiffs maintain that AEGON and its subsidiaries instructed their agents on the methods to employ the fraudulent sales and marketing scheme. The agents allegedly engaged in improper sales tactics and misrepresented and concealed material facts with AEGON's and its subsidiaries' approval and encouragement. (Doc. 13, ¶ 98.) AEGON and its subsidiaries assert that the sales agents were independent contractors and that it had no authority or responsibility to train and supervise the agents. (Doc. 28, at 24–25.) Consequently, AEGON and its subsidiaries contend that they are not liable for the Plaintiffs' damages.

 The rights and liabilities of the parties with respect to an issue in tort are determined by the law of the state with the most significant relationship to the occurrence and the parties. *Trumpet Vine,* 92 F.3d at 1116. The Plaintiffs' common law tort claim for reckless and wanton failure to train and supervise has the most significant relationship with the state of Iowa, and the Court will apply Iowa law.

 It is difficult at this stage of the proceedings to ascertain whether or not the agents were independent contractors and the level of control that AEGON and its subsidiaries exerted over the agents. Additionally, while it is true that the employer of an independent contractor is generally not liable for the contractor's negligence, the rule is far from absolute. *Kragel v. Wal–Mart Stores, Inc.,* 537 N.W.2d 699, 702–03 (Iowa 1995). As the Iowa Supreme Court has noted, this general rule is riddled with a number of common-law exceptions that have practically subsumed the rule. *Id.* at 702 (quoting *Rowley v. Mayor & City Council of Baltimore,* 305 Md. 456, 505 A.2d 494, 497 (1986)). AEGON and its subsidiaries have failed to cite (and the Court is unable to find) an apposite case which holds as a matter of law that an insurance company is not liable for the reckless and wanton actions of an independent insurance agent. Thus, it is conceivable that the Plaintiffs could prove a facts consistent with the allegations in the complaint that would entitle them to relief. Accordingly, the Court concludes that the Plaintiffs have alleged sufficient facts to state a facially valid claim for reckless and wanton failure to train and supervise.[11]

---

11. The Plaintiffs submitted a document titled "Supplement on Recent Authorities submitted by Defendants on Their Motion to Dismiss" after the case was transferred to this Court. (Doc. 87.) In the supplement, the Plaintiffs

### 6. Negligent Misrepresentation (Count VI)

The Plaintiffs also maintain that AEGON and its subsidiaries negligently made false and misleading statements of material fact to the Plaintiffs in the sales presentations and sales materials. The Plaintiffs allege that the insurance agents negligently described the life insurance policies as "retirement plans," "savings plans," or other non-insurance products. AEGON and its subsidiaries assert that the Plaintiffs' negligent misrepresentation claim fails as a matter of law because the Plaintiffs have failed to allege each element of negligent misrepresentation.

As the facts giving rise to the negligent misrepresentation claim are identical to the facts giving rise to the fraud claim in Count III, the Court will apply Iowa law in its analysis of the negligent misrepresentation claim consistent with section (II)(B)(3) of this Order. *See Trumpet Vine*, 92 F.3d at 1116.

■ A defendant will be held liable for negligent misrepresentation if, during the course of his business or employment, the defendant fails to exercise reasonable care in obtaining or communicating information to others and thereby supplies false information upon which the other individual justifiably relies. *Barske v. Rockwell Int'l Corp.*, 514 N.W.2d 917, 924 (Iowa 1994); Iowa Civil Jury Instruction 800.1 (1990).

■ The Defendants' bare assertion that the Plaintiffs have failed to adequately plead the elements of negligent misrepresentation overlooks the fact that the negligent misrepresentation claim implicates issues of fact not amenable to dismissal under Rule 12(b)(6). *See Force*, 4 F.Supp.2d at 851 (whether plaintiffs justifiably relied on misrepresentations is question of fact). AEGON and its subsidiaries have failed to identify a fundamental flaw in the pleading that would necessitate dis-

missal. Accordingly, this Court cannot find that the Plaintiffs could not, under any set of facts consistent with the pleadings, state a viable negligent misrepresentation claim. The motion to dismiss the negligent misrepresentation claim is denied.

### 7. Breach of the Duty of Good Faith and Fair Dealing (Count VII)

The Plaintiffs' next claim that the Defendants breached the duty of good faith and fair dealing. The Plaintiffs' complaint states that "[i]mplicit in the policies issued by the Subsidiary defendants to the plaintiffs and the Class was a duty of good faith and fair dealing owed by defendants to plaintiffs and the Class." (Doc. 13, ¶ 110.) The Plaintiffs allege that the breach occurred when the insurance agents failed to advise the Plaintiffs (1) that they were purchasing life insurance, (2) that a substantial part of the premiums that the Plaintiffs paid would not go toward a "retirement plan" or a "savings plan," but rather be used to pay sales commissions and other administrative charges, (3) what the true rate of return, (4) that money could not be withdrawn from the "retirement plans," and (5) about the actual identities, licenses, positions, and affiliations held by the Defendants' agents. (*Id.* at 50.) The Defendants' assert that breach of the duty cannot occur during pre-contract conduct.

■ Since a claim for breach of the duty of good faith and fair dealing is a contract claim, *see Force*, 4 F.Supp.2d at 856 n. 14, the Court will apply Florida's choice of law rules for contract claims. While Florida has adopted the most significant contacts approach of the Restatement (Second) of Conflicts of Laws for tort actions, *see supra*, the Florida Supreme Court has continued to apply the tradition-

---

again invoke the economic loss doctrine to "stave off" the claims for reckless failure to train and supervise and negligent misrepresentation. However, the Plaintiffs have failed to cite any case law supporting their position

that the rule precludes those types of claims. Consequently, the Court finds that the economic loss rule does not bar the failure to train and supervise claim (Count V) or the negligent misrepresentation claim (Count VI).

al *lex loci contractus* approach for contract actions. *Trumpet Vine,* 92 F.3d at 1119. Under the *lex loci contractus* method, issues concerning the validity and substantive obligations of contracts are governed by the law of the place where the contract is made. *Id.* A contract is made where the last act necessary to complete the contract is performed. *Id.*

 Although the parties have failed to brief which act constitutes the last act necessary to complete the contract, the Court will proceed to resolve the issue. The Court finds that the act of the Plaintiffs signing the insurance contracts constitutes the last act necessary to complete the contract. When the Plaintiffs signed the actual document, the terms of the contract became operative. Since the parties signed the contracts in their home states, the Court will apply Missouri and Florida law.

 A claim for breach of the duty of good faith and fair dealing in Missouri and Florida do not differ in any material way. *Greenfield v. Manor Care, Inc.,* 705 So.2d 926, 928 (Fla.Ct.App.1997); *Farmers' Electric Cooperative, Inc. v. Mo. Dept. of Corrections,* 977 S.W.2d 266, 271 (Mo.1998) (*en banc*). A covenant of good faith and fair dealing is implied in every contract. *Greenfield,* 705 So.2d at 928.

 In this case, the Plaintiffs maintain that the breach occurred in the context of the contract and not in the pre-contract conduct. Consequently, the Defendants' contention that the Plaintiffs' claim for breach of the duty of good faith and fair dealing is precluded because the claim only involves pre-contract conduct is unpersuasive. Additionally, two other district courts in the Eighth Circuit applying Florida law have held that similar claims survived motions to dismiss. *Force,* 4 F.Supp.2d at 855–56; *Parkhill,* 995 F.Supp. at 992–93. While the Court expresses no opinion on the ultimate resolution of the Plaintiffs' breach of good faith and fair dealing claim, AEGON and its subsidiaries have not met the substantial burden required for dismissal under Rule 12(b)(6).

### 8. Unjust Enrichment and Injunctive Relief (Counts VIII and IX)

The Plaintiffs have also asserted claims for unjust enrichment and declaratory and injunctive relief. (Doc. 13, at ¶ 118–121.) The Plaintiffs maintain that the Defendants' were unjustly enriched because they paid the Defendants for products that were not ultimately delivered. Additionally, the Plaintiffs urge the Court to (1) grant judgment declaring that the Defendants must provide benefits consistent with the agents' sales presentations and (2) enjoin the Defendants from soliciting the Plaintiffs to purchase its policies based on the fraudulent and deceptive sales and marketing scheme. *Id.*

AEGON and its subsidiaries move to dismiss the Plaintiffs' unjust enrichment claim because they maintain that a valid contract already exists. AEGON and its subsidiaries move to dismiss the declaratory judgment action because it doesn't describe what the declaration seeks. Finally, AEGON and its subsidiaries move to dismiss the claim for injunctive relief because the Plaintiffs have an adequate remedy at law, i.e., the Plaintiffs' damages can adequately be remediated in the form of money damages. (Doc. 28, at 26–28.)

 Several of the Plaintiffs' claims have survived the motion to dismiss. Because the Plaintiffs have stated viable legal claims for, *inter alia,* fraud, breach of fiduciary duty, and negligent misrepresentation, the claims for equitable relief will also withstand the Plaintiffs' motion to dismiss. *Force,* 4 F.Supp.2d at 860. Additionally, the Defendants' argument that the equitable claims should be dismissed because adequate legal remedies are available to the Plaintiffs is premature. "It is not generally a ground for dismissal of a complaint asserting equitable claims that the plaintiff has an adequate remedy at law." *Grove,* 14 F.Supp.2d at 1114 (quoting James Wm. Moore et al., 1 Moore's

Federal Practice § 2.03[2] (3d Ed.1997)). The Defendants have failed to explain why this case should be excepted from the general rule. Accordingly, the Defendants' motion to dismiss the claims for equitable relief is denied.[12]

### 9. Punitive Damages (Count X)

The Plaintiffs have also included a claim for punitive damages in their complaint. The Plaintiffs allege that AEGON's and its subsidiaries' fraudulent conduct in the course of the marketing and sales scheme warrants punitive damages. (Doc. 13, at ¶ 124.) AEGON and its subsidiaries contend that no reasonable basis exists for the punitive damages claim, and the Court should dismiss the claim. (Doc. 28, 18–20.)

Since the causes of action giving rise to the punitive damages claim (e.g., fraud) have the most significant relationship with the state of Iowa, and the Court will apply Iowa law on punitive damages.

Although punitive damages may not ultimately be warranted in this case under Iowa law, in the context of a Rule 12(b)(6) motion, such a finding would be premature. Since the allegations regarding the conduct of the Defendants adequately allege a claim for punitive damages under Iowa law, the Plaintiffs' motion to dismiss is denied.

### 10. Statute of Limitations

Finally, AEGON and its subsidiaries assert that all of the Plaintiffs' claims are barred by the applicable statutes of limitation. (Doc. 28, 30–33.) AEGON and its subsidiaries claim that the Plaintiffs knew or should have known that they were buying insurance policies when they received the written policies. They maintain that the limitations period began to run at that time. AEGON and its subsidiaries urge the Court to hold as a matter of law that the Plaintiffs should have known that the policies would not serve as an effective investment vehicle at the time the Plaintiffs received their policies. *Id.*

The Florida Supreme Court has adopted the most significant relationship test as defined in § 145 of the Restatement as the guide for use in choice-of-law cases involving statute of limitations questions. *Digioia v. H. Koch & Sons, Division of Wickes Manufacturing Co.,* 944 F.2d 809, 811 (11th Cir.1991). Again, Iowa has the most significant relationship to this case.

Allegations of fraud toll the statute of limitations. *Burgess v. Great Plains Bag Corp.,* 409 N.W.2d 676, 679 (Iowa 1987). Since the Plaintiffs' have adequately alleged fraud, the Court declines to find as a matter of law that the Plaintiffs are barred by the statute of limitations. *Grove,* 14 F.Supp.2d at 1108; *Force,* 4 F.Supp.2d at 859. It is possible to conceive of a set of facts consistent with the pleadings that state a viable negligent misrepresentation claim. The motion to dismiss on the statute of limitations defense is denied.

### ORDER

For the foregoing reasons, the Plaintiffs' motion to dismiss on all claims is **DENIED.**

---

12. The Plaintiffs conceded at oral argument that any claim for equitable relief would not be resolved until later in the proceedings. (Oral Arg. Trans., Doc. 111, at 59–60.) Consequently, the Court will only dispose of the motion to dismiss the equitable claims in this Order.